466 F.2d 345
 151 U.S.App.D.C. 174
 BANERCRAFT CLOTHING COMPANY, Inc.
v.
The RENEGOTIATION BOARD, Appellant.
ASTRO COMMUNICATION LABORATORY, A Division of Aiken Industries, Inc.
v.
The RENEGOTIATION BOARD, Appellant.
DAVID B. LILLY CO., Inc. et al.
v.
The RENEGOTIATION BOARD, Appellant.
 Nos. 24685, 24778 and 71-1025.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 9, 1972
Decided July 6, 1972.
 
 Mr. William D. Appler, Atty., Dept. of Justice, with whom Asst. Atty. Gen. L. Patrick Gray, III and Messrs. Thomas A. Flannery, U. S. Atty. at the time the brief was filed, and Walter H. Fleischer, Atty., Dept. of Justice, were on the brief, for appellant. Mr. Morton Hollander, Atty., Dept. of Justice, also entered an appearance for appellant.
 Mr. Robert L. Ackerly, Washington, D.C., with whom Mr. James J. Gallagher, Washington, D. C., was on the brief, for appellees in Nos. 24,685 and 24,778.
 Mr. Burton A. Schwalb, Washington, D. C., with whom Mr. Michael Evan Jaffe, Washington, D. C., was on the brief, for appellee in No. 71-1025.
 Before WRIGHT and MacKINNON, Circuit Judges, and MATTHEWS,* Senior District Judge, United States District Court for the District of Columbia.
 J. SKELLY WRIGHT, Circuit Judge:
 
 
 1
 These consolidated appeals present important questions, unresolved in this jurisdiction,[1] as to the remedial powers of District Courts under the Freedom of Information Act, 5 U.S.C. Sec. 552 (1970). The three appellees in these cases are each Government contractors subject to the Renegotiation Act of 1951, 50 U.S.C.App. Secs. 1211-1233 (1970), an elaborate statutory scheme designed to recoup excessive profits made by those doing business with the Government. During the renegotiation process, each appellee filed with the Renegotiation Board a proper request for documents connected with the process. See 5 U.S.C. Sec. 552(a)(3). In each case the Board rejected the request, citing one or more of the exemptions contained in the Information Act, 5 U.S.C. Sec. 552(b)(1)-(9), and in each case the contractor then filed suit in the District Court to force production of the documents. See 5 U.S.C. Sec. 552(a)(3).
 
 
 2
 On these appeals we are not asked to rule on the general applicability of the Information Act to the Renegotiation Board-an issue resolved by this court in Grumman Aircraft Engineering Corp. v. Renegotiation Board, 138 U.S. App.D.C. 147, 425 F.2d 578 (1970). Nor are we faced with the task of evaluating the various constitutional and statutory arguments which the Board advances in an effort to prevent forced production of the documents. Those issues are still sub judice in the various District Courts, and it would be improper for us to express any views on them until a final order from the District Court is appealed to us.[2] Rather, the question which divides the parties at this stage is the propriety of preliminary injunctions issued in each of these cases against continuation of the renegotiation process until the final status of the documents is determined. Appellees argued successfully in District Court that such an injunction was essential in order to preserve the status quo and prevent irreparable injury. Specifically, they claimed that without an injunction the renegotiation process would be completed long before the status of the disputed documents could be determined. Although completion of renegotiation would not formally moot the controversy, appellees contended, it would frustrate the purpose of the Information Act by depriving them of access to the documents during the period when such access would be useful.
 
 
 3
 In response the Board argued before the District Judges that the Freedom of Information Act nowhere conferred jurisdiction on trial judges to enjoin Board proceedings. Alternatively, the Board contended that, even if such jurisdiction could somehow be found, the doctrine of exhaustion of administrative remedies precluded equitable intervention in ongoing administrative procedures. Having unsuccessfully pressed these arguments at the trial level, the Board now reasserts them here. However, for the reasons detailed below, we find them insufficient to persuade us that the District Judges abused their discretion in granting preliminary injunctive relief. We hold that the Freedom of Information Act does confer jurisdiction on District Courts to enjoin administrative proceedings pending a judicial determination of the applicability of the Information Act to documents involved in those proceedings. We further hold that the exhaustion doctrine poses no obstacle to issuance of such an injunction in a proper case. It follows that all three decisions appealed from must be affirmed.
 
 I. The Renegotiation Act
 
 4
 Before evaluating the competing contentions of the parties in any detail, it is first necessary to understand the general contours of the Renegotiation Act and the procedural context in which each of these suits arises. The Renegotiation Act vests broad powers in the Renegotiation Board to eliminate excessive profits[3] secured by contractors and subcontractors engaged in the "national defense program." See 50 U.S.C.App. Sec. 1211. The Board exercises these powers by requiring every contractor or subcontractor subject to the Act to file a "Standard Form of Contractor's Report" containing detailed financial information. See 50 U.S.C.A.App. Sec. 1215(e)(1) (1972 pocket part); 32 C.F.R. Sec. 1470.3(a) (1972). On the basis of this information, the Board makes an initial determination as to whether the particular contract should be subject to renegotiation. If the Board decides to proceed, the case is referred to one of the Regional Renegotiation Boards which examines the Standard Form of Contractor's Report and gathers any additional information needed. Personnel employed by the Regional Board then prepare a "Report of Renegotiation" which includes a "recommendation with respect to the amount, if any, of excessive profits for the fiscal year under review." 32 C.F.R. Sec. 1472.3(d) (1972).
 
 
 5
 Upon receipt of the "Report of Renegotiation" the Regional Board examines the data de novo and makes its own tentative determination as to the amount of excess profits. 32 C.F.R. Sec. 1472.3(e). A conference is then held between the contractor and the regional personnel assigned to the case, at which the contractor is informed of the tentative determination and given an opportunity to present additional data and arguments. At the conclusion of the conference the contractor may either agree to the tentative determination or proceed to the next step. If he elects to contest the tentative determination, a second conference is arranged with a panel of the Regional Board. The panel hears any additional arguments the contractor may wish to make, and then submits its recommendation for a final disposition to the Regional Board-a recommendation which may be for a greater or lesser liability than that contained in the tentative determination. See 32 C.F.R. Sec. 1472.3(f), (h) & (i). Thereupon the Regional Board makes a final recommendation which, again, may be "greater than, equal to, or less than" the tentative determination. 32 C.F.R. Sec. 1472.3(i).
 
 
 6
 If the contractor is still dissatisfied, he then has recourse to the Renegotiation Board itself. Upon taking such an appeal, the contractor has his case assigned to a division of the Board which is not "bound or limited in any manner by any evaluation, recommendation or determination of the Regional Board." 32 C.F.R. Sec. 1472.4(b). The division studies the case de novo still another time and makes a recommendation to the Renegotiation Board. The Board then makes a final determination which, characteristically, "may be in an amount greater than, equal to, or less than" the prior determinations. 32 C.F.R. Sec. 1472.4(d).
 
 
 7
 The term "final determination" is something of a misnomer, however, since even at this stage the renegotiation process continues. The Board proceeds to negotiate with the contractor in an effort to secure his voluntary agreement. Only if this effort fails does the Board enter a final order determining the amount of excess profits. 32 C.F.R. Sec. 1472.4(d). This order brings the administrative process to a conclusion, but it still does not exhaust the contractor's remedies. An appeal of right lies to the United States Court of Claims which is explicitly directed to ignore all that has occurred before and to redetermine de novo the amount, if any, of excess profits. See 50 U.S.C.A.App. Sec. 1218 (1972 pocket part). The Court of Claims decision is reviewable in the Supreme Court by writ of certiorari. 50 U.S.C.A.App. Sec. 1218a (1972 pocket part).
 
 
 8
 At first blush this labyrinthine system of conferences, recommendations and seemingly endless de novo reviews may appear exceedingly wasteful. Upon closer examination, however, it becomes apparent that the Board's bureaucratic structure is carefully attuned to its statutory purpose. The Act's legislative history, as well as the Board's very name, make clear that Congress preferred negotiation to confrontation. Indeed, the Act itself requires the Board to "endeavor to make an agreement with the contractor or subcontractor with respect to the elimination of excessive profits." 50 U.S.C.A.App. Sec. 1215(a) (1972 pocket part). The Board's elaborate system of review is what provides the incentive for the contractor to reach such an agreement. To be sure, the adamant contractor is free to stand on his legal rights and pursue the statutory route all the way to the Court of Claims and beyond. But such a course entails considerable risk, since the de novo nature of each review means that the contractor's liability may well be increased if he pursues his remedies to the next rung of the bureaucratic ladder. Moreover, this risk bulks still larger when one considers the extremely vague standards which the Board uses to measure excessive profits. See note 3 supra. Given the dangers and uncertainty inherent in pursuing administrative appeals to their conclusion, it is hardly surprising that most contractors reach quasi-voluntary agreements at the lower and middle levels of the bureaucracy.[4]
 
 
 9
 These observations lead, in turn, to a paradox which has important implications for our decision in these cases. Although the recommendations made by the lower bureaucratic levels are in no sense final or formally coercive, they are nonetheless exceedingly important to the contractor. Indeed, their importance derives from their non-finality, since it is the possibility that they will be reversed and increased which provides the incentive to accept them without resort to theoretically available de novo appeals.
 
 
 10
 Thus appellees in these cases freely concede that they are still at the beginning of the administrative process and that, if the preliminary injunction were lifted, the initial unfavorable determination might well be reversed. In No. 24,778 the Eastern Regional Board has made a tentative determination that Astro Communications Laboratory owed the Government $225,000 for the year under review. Astro had held a conference with the Eastern Regional Board personnel assigned to the case and a meeting with a panel of the Regional Board had been scheduled when the District Court's injunction brought the process to a halt. In No. 24,685 the Eastern Regional Board had already made a final determination that Bannercraft Clothing Company owed $1,400,000 for excessive profits in 1967 before the District Court intervened. Bannercraft appealed this decision to the Renegotiation Board which, after meeting with the contractor, announced its determination that the company owed $175,000 for 1966 and $1,450,000 for 1967. Bannercraft then obtained an injunction aborting the final stages of negotiation required before the Board can issue a binding order. Finally, in No. 71-1025 the David B. Lilly Company has been informed by personnel of the Eastern Regional Board that they would recommend to the Regional Board an assessment against the company of $7,000,000 for excess profits realized in fiscal 1967. The District Court granted a preliminary injunction before Lilly had decided whether to exercise its right to a conference with a panel of the Regional Board.
 
 
 11
 Clearly, then, in all three cases the administrative remedies are not yet exhausted. Even in No. 24,685, which is farthest advanced, Bannercraft still has a final opportunity to negotiate a lower settlement with the Board, followed by a complete de novo reexamination of the case in the Court of Claims and possible review in the Supreme Court. But although appellees concede that their liability may be reduced or eliminated, rather than increased, at a later stage of the administrative process, they nonetheless insist that they need documents in the Board's possession to decide whether to risk further review. These documents, appellees contend, would reveal the strength of the Board's case against them and the facts on which the Board relies in assessing liability. Without them, meaningful negotiation as envisioned by the statute becomes difficult or impossible.
 
 
 12
 From this perspective, the availability of later administrative relief is largely irrelevant. Appellees claim that they need the documents now so they can take part in the vital negotiating process presently under way. Future de novo review, they say, cannot compensate for present ignorance, especially when that ignorance could have an important bearing on intermediary decisions which as a practical matter may end the dispute.
 
 
 13
 Of course, the mere fact that appellees need present access to the documents does not mean that District Courts are entitled to enjoin ongoing proceedings until their status is decided. Even a forceful demonstration of pending irreparable injury will not support an injunction if the trial court has no jurisdiction to issue it or if the exhaustion doctrine makes its issuance premature. The existence of present need for judicial intervention does have a bearing on both jurisdiction and exhaustion, however, and appellees' demonstration of such a need must be kept in mind when these issues, to which we now turn, are examined.
 
 II. Jurisdiction
 
 14
 The threshold issue in each of these cases is whether anything in the Freedom of Information Act confers jurisdiction on District Courts to enjoin ongoing administrative proceedings while the question of whether to require production of disputed documents is sub judice. Certainly the Board is correct when it points out that nothing in the Act explicitly confers such jurisdiction. While the statute states that "the district court of the United States * * * has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld," 5 U.S. C. Sec. 552(a)(3), it does not in terms confer jurisdiction to enjoin agency proceedings until the records are produced or until their status is decided. Moreover, the Board argues, the legislative history of the Freedom of Information Act makes plain that Congress harbored no such intent. Both the House and Senate Reports indicate that when Congress passed the bill it was mainly concerned with providing information to the press and to the public generally rather than to parties in the middle of administrative litigation.[5] The main thrust of the Act is away from the notion that public records should be available only to those who demonstrate a specialized need for them and toward a system of universal access.[6] See, e. g., K. Davis, Administrative Law Treatise Sec. 3A.4 (1970 Supp.); Getman v. NLRB, 146 U.S.App.D.C. 209, 218, 450 F.2d 670, 679 (1971). It would therefore be ironic indeed, the Board contends, if the statute were interpreted to authorize equitable intervention on the basis of specialized need. Cf. Sears, Roebuck & Co. v. NLRB, 6 Cir., 433 F.2d 210, 211 970).
 
 
 15
 But although it is undeniably true that Congress was principally interested in opening administrative processes to the scrutiny of the press and general public when it passed the Information Act, the Board interprets the congressional intent too narrowly when it insists this was the only purpose the Act was designed to serve. As the Act's history makes clear, Congress was also troubled by the plight of those forced to litigate with agencies on the basis of secret laws or incomplete information. For example, as the Senate Report explains:
 
 
 16
 "Requiring the agencies to keep a current index of their orders, opinions, etc., is necessary to afford the private citizen the essential information to enable him to deal effectively and knowledgeably with the Federal agencies. This change will prevent a citizen from losing a controversy with an agency because of some obscure and hidden order or opinion which the agency knows about but which has been unavailable to the citizen simply because he had no way in which to discover it. * * *"
 
 
 17
 Senate Report at 7. (Emphasis added.) See also House Report at 8. Cf. 5 U.S. C. Sec. 552(a)(2):
 
 
 18
 "* * * A final order, opinion, statement of policy, interpretation, or staff manual or instruction that affects a member of the public may be relied on, used, or cited as precedent by an agency against a party other than an agency only if-
 
 
 19
 "(i) it has been * * * made available or published as provided by this paragraph * * *."
 
 
 20
 When this subsidiary statutory purpose is kept in mind, the possibility that Congress intended to authorize injunctions against pending administrative proceedings until secret records are revealed or their status determined seems less unlikely.
 
 
 21
 Nor is the fact that the Act nowhere in terms authorizes such injunctions fatal to appellees' case. It must be remembered that Congress does not legislate in a vacuum. Rather, "the governing statutes have been enacted in the context of a body of general concepts developed and developing which define the appropriate relation of agencies and courts." L. Jaffe, Judicial Control of Administrative Action 426 (1965). Historically, courts sitting in equity have had broad powers to do justice and avoid irreparable injury, and when Congress confers equitable jurisdiction upon a court, it is reasonable to assume that the legislature is aware of this tradition.
 
 
 22
 "* * * When Congress entrusts to an equity court the enforcement of prohibitions contained in a regulatory enactment, it must be taken to have acted cognizant of the historic power of equity to provide complete relief in light of the statutory purposes. As this Court long ago recognized, 'there is inherent in the Courts of Equity a jurisdiction to * * * give effect to the policy of the legislature.' Clark v. Smith, 13 Pet. 195, 203 [10 L.Ed. 123]. * * *"
 
 
 23
 Mitchell v. Robert DeMario Jewelry, Inc., 361 U.S. 288, 291-292, 80 S.Ct. 332, 335, 4 L.Ed.2d 323 (1960). See also Hecht Co. v. Bowles, 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754 (1944).
 
 
 24
 Among the oldest of equity's powers is the inherent authority to preserve the status quo pending a judicial review of the merits.
 
 
 25
 "No court can make time stand still. The circumstances surrounding a controversy may change irrevocably during the pendency of an appeal, despite anything a court can do. But within these limits it is reasonable that an appellate court should be able to prevent irreparable injury to the parties or to the public resulting from the premature enforcement of a determination which may later be found to have been wrong. * * *"
 
 
 26
 Scripps-Howard Radio v. FCC, 316 U.S. 4, 9, 62 S.Ct. 875, 879, 86 L.Ed. 1229 (1942). Nor have the courts been troubled by applying this rule to stays of pending administrative actions. See, e. g., Murray v. Kunzig, 149 U.S.App.D.C. 256, 462 F.2d 871 (1972). See generally L. Jaffe, supra, at 687-708. Although the rule has been variously justified as part of an equity court's "traditional equipment for the administration of justice," Scripps-Howard Radio v. FCC, supra, 316 U.S. at 9-10, 62 S.Ct. at 880, or as stemming from power conferred by the All Writs Act, Application of President & Directors of Georgetown College, Inc., 118 U.S.App.D.C. 80, 84-86, 331 F. 2d 1000, 1004-1006 (1964), it has never been thought that the power must be embodied in a specific statute. On the contrary, the usual presumption is that "if Congress had intended to make * * * a drastic departure from the traditions of equity practice, an unequivocal statement of its purpose would have been made." Hecht Co. v. Bowles, supra, 321 U.S. at 329, 64 S.Ct. at 591. See also Porter v. Warner Holding Co., 328 U.S. 395, 398, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946).
 
 
 27
 Our opinion in this regard is unchanged by the decisions of this and other courts holding that the Freedom of Information Act does not permit a court to balance the equities before ordering release of records within the Act's ambit. See Getman v. NLRB, supra, 146 U.S.App.D.C. at 218-219, 450 F.2d at 679-680; Soucie v. David, 145 U.S.App. D.C. 144, 153-154, 448 F.2d 1067, 1076-1077 (1971); Wellford v. Hardin, 4 Cir., 444 F.2d 21 (1971). But see K. Davis, supra, Sec. 3A.6 (1970 Supp.); General Services Administration v. Benson, 9 Cir., 415 F.2d 878, 880 (1969). Our refusal to balance the equities in ordering production of records is based upon Congress' explicit rejection of need as a standard for disclosure, see text at note 6 supra, and its clearly stated command that all documents must be disclosed except those mentioned in specific, narrowly drawn exceptions. "Since judicial use of traditional equitable principles to prevent disclosure would upset this legislative resolution of conflicting interests, we are persuaded that Congress did not intend to confer on district courts a general power to deny relief on equitable grounds apart from the exemptions in the Act itself." Soucie v. David, supra, 145 U.S.App.D.C. at 154, 448 F.2d at 1077.
 
 
 28
 It hardly follows, however, that Congress intended to withhold any of the usual weapons in the arsenal of equity which ensure conformance to the legislative will. It is one thing to say that Congress has decided for itself which kinds of documents should be disclosed, leaving little if any discretion for the courts. It is quite another to suggest that Congress has deliberately withheld the tools necessary for courts to implement its substantive decisions. Since temporary stays of pending administrative procedures may be necessary on occasion to enforce the policy of the Freedom of Information Act, we hold that the District Court has jurisdiction to issue such stays. Cf. Bristol-Myers Co. v. FTC, 138 U.S.App.D.C. 22, 424 F.2d 935 (1970).
 
 III. Exhaustion
 
 29
 Of course, the bare existence of jurisdiction does not mean that appellees were entitled to the relief they were granted by the District Court. There is more to winning a lawsuit than demonstrating that the court possesses the naked power to act. The plaintiff must also show that the case has reached a posture in which judicial intervention would be effective and appropriate. At least since Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938), this showing has included a demonstration that available administrative remedies have been exhausted. While the exhaustion doctrine is occasionally referred to in a loose sense as "jurisdictional," it should not be confused with the type of jurisdictional question discussed above. Jurisdiction, as the term is properly used, goes to the power of the court to act; exhaustion, on the other hand, goes to the timing of the action. Whereas a jurisdictional bar is, in most cases, absolute, the exhaustion requirement, like the related abstention and ripeness doctrines, is subject to the sound discretion of the court. See, e. g., Sohm v. Fowler, 124 U.S.App.D.C. 382, 385, 365 F.2d 915, 918 (1966).
 
 
 30
 In a recent Freedom of Information Act case, this court intimated that the exhaustion doctrine would not prevent equitable intervention in a pending administrative proceeding while the status of contested documents was litigated. See Bristol-Myers Co. v. FTC, supra, 138 U.S.App.D.C. at 27, 424 F.2d at 940. Appellant now urges us to reject this dicta. It cites to us three cases, not involving the Freedom of Information Act, in which the Supreme Court disapproved premature judicial intervention in the renegotiation process-see Lichter v. United States, 334 U.S. 742, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948); Aircraft & Diesel Equipment Corp. v. Hirsch, 331 U.S. 752, 67 S.Ct. 1493, 91 L.Ed. 1796 (1947); Macauley v. Waterman Steamship Corp., 327 U.S. 540, 66 S.Ct. 712, 90 L.Ed. 839 (1946)-and extrapolates from these cases the general rule that it is always improper for a court to interfere with pending administrative proceedings. But as the cases listed in the margin clearly demonstrate, there is simply no such general rule.[7] To be sure, many other cases can be cited for the proposition that courts on occasion refuse to interfere with pending administrative proceedings.[8] But this conflict only illustrates the danger inherent in making easy generalizations about the exhaustion doctrine. Professor Davis has put it bluntly: "Despite the many absolute statements in judicial opinions that judicial relief is withheld until administrative remedies have been exhausted, the holdings show that exhaustion is sometimes required and sometimes not. No opinion of the Supreme Court explains the contrariety of holdings * * *." 3 K. Davis, Administrative Law Treatise Sec. 20.10 (1958).
 
 
 31
 No doubt much of this confusion stems from the fact that exhaustion is not really a coherent doctrine at all. Rather, the exhaustion label uneasily unites a number of quite disparate policy considerations which sometimes work at cross purposes and always require individual examination. As the Supreme Court has made clear, "The doctrine is applied in a number of different situations and is, like most judicial doctrines, subject to numerous exceptions. Application of the doctrine to specific cases requires an understanding of its purposes and of the particular administrative scheme involved." McKart v. United States, 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1969).
 
 
 32
 When the exhaustion doctrine is broken down into its component parts, the task of making sense out of the many cases becomes considerably less formidable. Moreover, when the purposes of the doctrine are individually measured against the facts of these cases, it is plain that no legitimate judicial policy would be served by depriving these appellees of the relief they seek. Since exhaustion here would serve no purpose, it follows that the District Judges acted within their discretion and that their decisions should not be disturbed.
 
 A. Irreparable Injury
 
 33
 The first purpose served by the exhaustion doctrine stems not so much from the law of administrative agencies as from general equity jurisprudence. A party seeking equitable relief must always show that he would suffer some sort of irreparable injury without it. See, e. g., Petroleum Exploration, Inc. v. Public Service Comm'n, 304 U.S. 209, 222, 58 S.Ct. 834, 82 L.Ed. 1294 (1938). Moreover, the usual expense and annoyance which accompany vindication of a right through normal legal channels is not the sort of irreparable injury of which equity generally takes cognizance. See, e. g., Myers v. Bethlehem Shipbuilding Corp., supra, 303 U.S. at 51-52, 58 S.Ct. 459. Cf. Douglas v. City of Jeannette, 319 U.S. 157, 163, 63 S.Ct. 877, 87 L.Ed. 1324 (1943). Thus under normal circumstances a party who must undergo an administrative proceeding does not, by that fact alone, suffer sufficient injury to trigger equitable intervention. See Virginia Petroleum Jobbers Assn v. FPC, 104 U.S.App.D.C. 106, 110, 259 F. 2d 921, 925 (1958).
 
 
 34
 It does not follow, however, that the harm stemming from pending administrative proceedings can never be so great as to be "irreparable." Cf. Dombrowski v. Pfister, 380 U.S. 479, 85 S. Ct. 1116, 14 L.Ed.2d 22 (1965). If the expenses incident to the administrative litigation are extraordinary, equitable relief may be appropriate. See Public Utilities Comm'n of Ohio v. United Fuel Gas Co., 317 U.S. 456, 469, 63 S.Ct. 369, 87 L.Ed. 396 (1943). Similarly, if the administrative proceeding is too protracted, equity may intervene. See Smith v. Illinois Bell Telephone Co., 270 U.S. 587, 591, 46 S.Ct. 408, 70 L.Ed. 747 (1926). And, of course, if an administrative body threatens invasion of important substantive rights, an equity court need not stand helplessly by until the damage has been done. See Utah Fuel Co. v. National Bituminous Coal Comm'n, 306 U.S. 56, 59 S.Ct. 409, 83 L.Ed. 483 (1939). Cf. National Student Assn v. Hershey, 134 U.S.App.D.C. 56, 412 F.2d 1103 (1969).
 
 
 35
 In our view, appellees in these cases have demonstrated an impending injury which is different in kind from that inevitably associated with any administrative proceeding. As demonstrated in Part I supra, the contractors assert a need for the disputed documents in order to engage in the sort of informed negotiation with the Board which Congress intended. They also seek access to information which will help them decide whether to accept the Board's latest offer or pursue further channels of review, thereby risking imposition of a larger penalty. It is senseless to say that the injuries they will suffer if not given the documents are merely incidental to the administrative process. Appellees' point is that the administrative process cannot function as it was intended to function until they are given access to the documents. Thus these cases are quite different from cases where parties have complained that administrative procedures are themselves burdensome. Our appellees would like to take advantage of the renegotiation process, but claim an inability to do so effectively until the Board complies with the Freedom of Information Act. If these facts are true, and it is for the trial court to determine in the first instance whether they are true or not, then appellees have demonstrated the sort of clear threat to a statutory right which can easily be categorized as an impending irreparable injury.
 
 B. No Adequate Remedy at Law
 
 36
 Closely allied to the irreparable injury requirement is a second doctrine, again stemming from general equity jurisprudence, which requires a demonstration of no adequate remedy at law.[9] Under normal circumstances, a party aggrieved at some early stage of the administrative process can secure relief through normal administrative channels. So long as such relief is available, it cannot be said that his remedy at law is inadequate and, hence, equity will not intervene. See, e. g., Aircraft & Diesel Corp. v. Hirsch, supra, 331 U.S. at 778, 67 S.Ct. 1493. Thus courts have frequently refused to interfere with pending administrative proceedings on the ground that the aggrieved party "has an adequate remedy within the four corners of the Act * * *," Virginia Petroleum Jobbers Assn v. FPC, supra, 104 U. S.App.D.C. at 109, 259 F.2d at 924, or because any "error may be reviewed and corrected in the event that the respondent below is finally required to cease and desist from the challenged method of competition or practice." Texaco, Inc. v. FTC, 5 Cir., 301 F.2d 662, 663 (1962). As the Fifth Circuit explained in the context of Federal Trade Commission proceedings:
 
 
 37
 "Jurisdiction to review proceedings conducted by the Federal Trade Commission pursuant to Section 7 of the Clayton Act * * * is conferred upon the Court of Appeals by Section 11(c) of the Act * * *. Section 11(d) * * * makes that jurisdiction exclusive. All constitutional, jurisdictional, substantive, and procedural issues arising in Commission proceedings may be considered in a Section 11(c) appeal * * * and this statutory right to review has long been viewed as constituting a speedy and adequate remedy at law. * * *"
 
 
 38
 Frito-Lay, Inc. v. FTC, 5 Cir., 380 F.2d 8, 9-10 (1967).
 
 
 39
 But while this rule is obviously sound, it is equally obvious that it has no relevance to these cases. In the first place, even if we assume for the moment that there is a remedy for Freedom of Information Act violations "within the four corners" of the Renegotiation Act, that remedy will not prevent the irreparable injury which the contractors fear. Because the statutory review procedures are all de novo, the review will be geared to a determination of whether in fact appellees realized excess profits. Clearly the reviewing bodies will not consider whether the contractors could have negotiated better settlements at a lower level if they had had access to the disputed documents. Nor will these bodies consider the possibility that if the documents had been made available appellees might not have appealed at all and thus not risked imposition of more extensive liability.
 
 
 40
 These cases are similar to Elmo Division of Drive-X Co. v. Dixon, 121 U.S. App.D.C. 113, 115, 348 F.2d 342, 344 (1965), in that "[t]he type of procedural error [appellees] assert[] is not of a kind which affects the [Board's] substantive findings; no one suggests that the [Board's] * * * procedure is unreliable as a fact-finding mechanism." (Emphasis in original.) In that case we held that "[t]he prospect of ultimate appellate review of any final order issuing out of the * * * complaint proceeding is not adequate." Ibid. Similarly, it should be apparent here that if the contractors are to be granted relief at all they must have it now before the administrative momentum carries their cases beyond the point where the harm can be undone. If we take Congress' declaration of purpose seriously, then the parties are supposed to negotiate over excess profits at the lower administrative levels. The seemingly endless de novo reviews were intended to make the negotiating process work, not to provide a substitute for negotiation. If the negotiating process fails to occur, the opportunity is lost forever. To say that compulsory awards imposed by the Board or the Court of Claims at the end of the process provide an adequate remedy is to ignore the difference between an agreement freely arrived at, as preferred by Congress, and a judgment imposed by a court of law.
 
 
 41
 Moreover, assuming arguendo that the damage could somehow be undone at a later stage of the proceedings, it is still far from clear that the Renegotiation Board or the Court of Claims has jurisdiction to afford the necessary relief. The Fifth Circuit could require exhaustion in Frito-Lay, Inc. v. FTC, supra, because the Clayton Act vested full power in the Court of Appeals to correct any errors made by the Commission. But the Renegotiation Act vests no power in the Court of Claims to correct errors made under the Freedom of Information Act. The Information Act confers jurisdiction on the District Court to order production of appropriate documents, and there is no reason to assume that this jurisdiction was not intended to be exclusive. See K. Davis, supra, Sec. 3A.27 (1970 Supp.). But cf. Polymers, Inc. v. NLRB, 2 Cir., 414 F.2d 999, 1006 (1969). Certainly it cannot be said that Congress intended the Board to enforce the Information Act against itself when one remembers that the main purpose of the Act was to provide a disinterested forum to assess the discoverability of agency records. See Senate Report at 3; House Report at 2.
 
 
 42
 It is this argument, among others,[10] which distinguishes this case from the superficially similar fact pattern presented in Sterling Drug Inc. v. FTC, 146 U.S.App.D.C. 237, 450 F.2d 698 (1971). In Sterling Drug, as in these cases, a party before an agency sought production of documents under the Freedom of Information Act and the due process clause of the Constitution. But as Judge Tamm's opinion makes clear, the drug company sought to enjoin further agency hearings only under the theory that such hearings, without production of requested documents, would constitute a denial of due process.[11] The court properly rejected this argument, holding that if the company utilized the normal review procedure any denials of due process could be corrected by a reviewing court or by the agency itself. Since this procedure constituted an adequate remedy at law, equitable intervention was improper.
 
 
 43
 At the same time, however, Judge Tamm pointed out that "[i]n applying these [exhaustion] principles in cases involving interlocutory appeals from agency action, the courts appear to have formulated the general rule that a party may bypass established avenues for review within the agency * * * where the issue in question cannot be raised from a later order of the agency * * *." 146 U.S.App.D.C. at 249, 450 F.2d at 710. That, of course, is our case. Since a violation of the Freedom of Information Act can only be asserted in a collateral District Court action, it is pointless to remand appellees to their administrative remedies. The plain fact is that there are no administrative remedies under the Freedom of Information Act. Once a party has properly requested information from an agency, he has exhausted all the administrative avenues of relief which the Act provides. His only remaining remedy is an action in United States District Court-the very mode of relief which our appellees sought and which the Board now attempts to frustrate by pointing to other "remedies" which do not exist and which would not provide adequate relief if they did exist. Cf. United States Alkali Export Assn v. United States, 325 U.S. 196, 210, 65 S.Ct. 1120, 89 L.Ed. 1554 (1945).
 
 
 44
 Equity, of course, will not require performance of a useless act and, by the same token, exhaustion has never been thought to require parties to be "buffeted from 'pillar to post' in a vain search for a tribunal that can vouchsafe to them their rights." Randolph v. Missouri-Kansas-Texas R. Co., W.D.Mo., 85 F.Supp. 846, 847 (1949), affirmed, 8 Cir., 182 F.2d 996 (1950). Since appellees will not be able to assert a Freedom of Information Act violation on appeal from the Renegotiation Board decision, they must assert it now if they are to do so at all. It follows that their remedy at law is inadequate and that the traditional prerequisites for equitable intervention have been satisfied.
 
 C. Respect for Administrative Jurisdiction
 
 45
 As the discussion above should make clear, a good part of the exhaustion doctrine involves no more than a specialized application of the traditional tenets of equity. It would be a mistake, however, to assume that the exhaustion doctrine has no independent existence. There is another set of principles encompassed within the exhaustion rule which is special to administrative law and has no precise analogue in general equity practice. As the Supreme Court has recently explained:
 
 
 46
 "* * * [T]he most common application of the exhaustion doctrine is in cases where the relevant statute provides that certain administrative procedures shall be exclusive. * * * The reasons for making such procedures exclusive, and for the judicial application of the exhaustion doctrine in cases where the statutory requirement of exclusivity is not so explicit, are not difficult to understand. A primary purpose is, of course, the avoidance of premature interruption of the administrative process. The agency, like a trial court, is created for the purpose of applying a statute in the first instance. Accordingly, it is normally desirable to let the agency develop the necessary factual background upon which decisions should be based. And since agency decisions are frequently of a discretionary nature or frequently require expertise, the agency should be given the first chance to exercise that discretion or to apply that expertise. And of course it is generally more efficient for the administrative process to go forward without interruption than it is to permit the parties to seek aid from the courts at various intermediate stages. * * *"
 
 
 47
 McKart v. United States, supra, 395 U.S. at 193, 89 S.Ct. at 1662.
 
 
 48
 Exhaustion, then, is in part a doctrine of comity. But whereas all the limitations on equity have their ultimate roots in comity, the exhaustion requirement gains added force from the specific congressional command that certain questions be decided in the first instance by agencies rather than by courts. It was this command which the Supreme Court noted and primarily relied upon when it rejected premature review of Renegotiation Board decisions a quarter of a century ago. Thus "[t]he legislative history of the Renegotiation Act * * * shows that Congress intended the Tax Court [now the Court of Claims] to have exclusive jurisdiction to decide questions of fact and law * * *. In order to grant the injunction sought the District Court would have to decide this issue in the first instance. Whether it ever can do so or not, it cannot now decide questions of coverage when the administrative agencies authorized to do so have not yet made their determination." Macauley v. Waterman Steamship Corp., supra, 327 U.S. at 544, 66 S.Ct. at 714, 90 L.Ed. 839. See also Lichter v. United States, supra, 334 U.S. at 792, 68 S.Ct. 1294, 92 L.Ed. 1694; Aircraft & Diesel Equipment Corp. v. Hirsch, supra, 331 U.S. at 775, 67 S.Ct. 1493. The general equitable principles discussed above were recognized, but they were buttressed with additional arguments deriving from Congress' unquestioned power to assign primary jurisdiction over certain matters to administrative agencies.
 
 
 49
 "Whatever may be the scope allowed generally for equity to intervene upon the ground of inadequacy of legal remedies, where no explicit congressional command exists for following a prescribed procedure, the problem when such a mandate is present is entirely different from one tendered in its absence. The very fact that Congress has made the direction must be cast into the scales as against the factors which, without that fact, would or might be of sufficient weight to turn the balance in favor of allowing utilization of equity's resources. * * *"
 
 
 50
 Aircraft & Diesel Equipment Corp. v. Hirsch, supra, 331 U.S. at 774-775, 67 S.Ct. at 1504.
 
 
 51
 But although the agencies must be granted broad deference when they act within their congressionally assigned roles, it hardly follows that they are due such deference when they exceed the bounds of their proper jurisdiction. The Supreme Court has therefore stated that it will not require exhaustion when a party alleges that "there is no properly authorized administrative procedure for it to exhaust and that the administrative authorities who seek to determine its case have no lawful right to do so." Allen v. Grand Central Aircraft Co., 347 U.S. 535, 540, 74 S.Ct. 745, 748, 98 L.Ed. 933 (1964). It must be conceded that, as formulated, this principle is overly broad and cannot be reconciled with all the cases. See 3 K. Davis, supra, Sec. 20.02, at 65-66. As the Court made clear early on:
 
 
 52
 "* * * [T]he rule requiring exhaustion of the administrative remedy cannot be circumvented by asserting that the charge on which the complaint rests is groundless and that the mere holding of the prescribed administrative hearing would result in irreparable damage. Lawsuits also often prove to have been groundless; but no way has been discovered of relieving a defendant from the necessity of a trial to establish the fact."
 
 
 53
 Myers v. Bethlehem Shipbuilding Corp., supra, 303 U.S. at 51-52, 58 S.Ct. at 464. But although exhaustion may not be avoided by the mere assertion that an agency is operating ultra vires, courts have frequently excused parties from exhausting remedies when an agency appears on the face of the record to be exceeding its proper authority. See, e. g., Oestereich v. Selective Service System, 393 U.S. 233, 89 S.Ct. 414, 21 L.Ed.2d 402 (1968); McCulloch v. Sociedad Nacional de Marineros de Honduras, 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963); Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958).
 
 
 54
 What makes our cases unique is the fact that here the Board's lack of authority to enforce the Freedom of Information Act is not only clear from the face of the record; it is entirely uncontested. The Act in terms confers jurisdiction to enforce its provisions on the United States District Court alone, and we do not understand the Board to argue otherwise. See text at note 11 supra. Obviously, then, these cases fall within the Grand Central rule. If ever there is a case where "there is no properly authorized administrative procedure * * * to exhaust," then surely this is it.
 
 
 55
 It should be equally obvious that the Waterman-Aircraft-Lichter line of cases is totally inapposite. Appellees are not attempting to wrest from the Board authority which Congress has properly delegated to it. They do not ask the court to resolve questions as to the extent of their liability or susceptibility to renegotiation-questions which the Board should answer in the first instance. Rather, appellees seek determination of a question over which the Board plainly lacks jurisdiction-viz., the discoverability of documents under the Freedom of Information Act. True, appellees would have the court suspend renegotiation until that question can be answered. But that suspension does not change the ultimate power of the Board to decide all questions within its jurisdiction in the first instance. Cf. Murray v. Kunzig, supra. Our appellees, like the appellant in Elmo Division of Drive-X Co. v. Dixon, supra, object "not to the fact of the [Board's] making an initial substantive determination but rather to the process by which it has chosen to do so." 121 U.S.App.D.C. at 115, 348 F.2d at 344. The preliminary injunctions granted by the District Court merely ensure that the negotiating process will operate as Congress intended it to operate and that the policy of the Freedom of Information Act will be respected.
 
 IV. Conclusion
 
 56
 We are not, of course, unmindful of the delay which judicial intervention in the renegotiation process might cause and of the Government's legitimate interest in speedily recovering funds which rightfully belong to it.[12] Contractors have a right to inspect documents covered by the Freedom of Information Act, but they have no right to delay recovery of public monies indefinitely while they endlessly litigate collateral issues.
 
 
 57
 But in fact it seems likely that the delay incident to assertion of most claims under the Information Act will be insubstantial. It should be remembered that these are test cases and that the meticulous briefing and detailed argument which has slowed their movement through the courts is unlikely to be repeated. Generally, it should be unnecessary to enjoin Board proceedings for more than the few days it takes the trial judge to inspect the documents in camera and reach a decision as to their status. And it should be noted that the Act itself directs the District Court to give precedence to Freedom of Information Act claims and set them for trial "at the earliest practicable date." 5 U. S.C. Sec. 552(a)(3).
 
 
 58
 Moreover, if an Information Act claim does promise to delay substantially Board proceedings, the District Court is certainly authorized to take that fact into account when it exercises its discretion. One of the factors which an equity court must consider when deciding whether to issue a preliminary injunction is the public interest, and the public interest in speedy completion of contract renegotiations is not to be doubted. All we hold today is that the hypothetical possibility that some injunctions against Board proceedings may be improper does not justify a prophylactic rule against all such injunctions. "It will be time enough to consider the relief to which the Board is entitled if and when a showing of disruption of Board functions is made." Getman v. NLRB, supra, 146 U.S.App. D.C. at 214, 450 F.2d at 675.
 
 
 59
 Since the District Court properly assumed jurisdiction in these cases and since no abuse of discretion has been shown, each of the orders appealed from must be affirmed. In order to minimize the delay before the Board occasioned by these proceedings, the District Court should proceed to a decision on the merits forthwith.
 
 
 60
 Affirmed.
 
 MacKINNON, Circuit Judge, dissenting:
 
 61
 While I must confess my admiration for the skillfully crafted opinion of the majority, I find imbedded within its seductive virtuosity fundamental errors that compel me to respectfully dissent.
 
 
 62
 * The most serious error of the majority, an error bordering on constitutional dimensions, is the statement at page 351 that:
 
 
 63
 The existence of present need for judicial intervention does have a bearing on both jurisdiction and exhaustion, however, and appellees' demonstration of such a need must be kept in mind when these issues, to which we now turn are examined. [Emphasis added.]
 
 
 64
 That the federal courts are courts of limited jurisdiction is a proposition beyond question. The Confiscation Cases, 87 U.S. (20 Wall.) 92, 22 L.Ed. 320 (1874); Sheldon v. Sill, 49 U.S. (8 How.) 441, 12 L.Ed. 1147 (1850); 1 Barron & Holtzoff, Federal Practice and Procedure Sec. 21 (Wright ed. 1960):
 
 
 65
 While the Constitution of the United States defines the federal judicial power, it does not itself grant such power or any part thereof to the United States District Courts. The jurisdiction of the district courts is therefore determined and limited by Congress. In other words, the district courts must find their jurisdiction in express provisions of the federal statutes. [Citations omitted, emphasis added.]
 
 
 66
 In brief, the appellees "need for judicial intervention" is wholly irrelevant to determination of the jurisdiction of the District Courts in these cases. Our sole inquiry should be whether or not Congress conferred upon them jurisdiction to enjoin ongoing administrative proceedings while considering appellees' requests for documents pursuant to the Freedom of Information Act.
 
 
 67
 The majority concedes that nothing in the Act expressly confers such jurisdiction, nevertheless through inference and analogy they strain to create a jurisdiction which Congress did not consider appropriate to grant. In doing so, the majority ignores another principle of law nearly as venerable as the doctrine of Sheldon v. Sill, supra. In 1919 Mr. Justice Brandeis noted:
 
 
 68
 These general rules are well settled: . . . (2) That, where a statute creates a right and provides a special remedy, that remedy is exclusive.
 
 
 69
 United States v. Babcock, 250 U.S. 328, 331, 39 S.Ct. 464, 465, 63 L.Ed. 1011 (1919), citing D. R. Wilder Mfg. Co. v. Corn Products Refining Co., 236 U.S. 165, 174, 175, 35 S.Ct. 398, 59 L.Ed. 520 (1915); Arnson v. Murphy, 109 U. S. 238, 3 S.Ct. 184, 27 L.Ed. 920 (1883); Barnet v. National Bank, 98 U.S. 555, 558, 25 L.Ed. 212 (1878); Farmers & Mechanics Nat'l Bank v. Dearing, 91 U. S. 29, 35 (1875). This doctrine remains valid today. See, Switchmens Union of North America v. National Mediation Board, 320 U.S. 297, 64 S.Ct. 95, 88 L. Ed. 61 (1943); cf. Reisman v. Caplin 375 U.S. 440, 450, 84 S.Ct. 508, 11 L. Ed.2d 459 (1964). In the Freedom of Information Act, Congress created in the general public an express right of access to all information of the Federal Government not within one of the statute's exempted categories. See, Getman v. NLRB, 146 U.S.App.D.C. 209, 450 F. 2d 670 (1971); Soucie v. David, 145 U. S.App.D.C. 144, 448 F.2d 1067 (1971); Wellford v. Hardin, 444 F.2d 21 (4th Cir. 1971); K. Davis, Administrative Law Treatise Sec. 3A.4 (1970 Supp.). To effectuate that right, Congress provided the specific, narrow, remedies of an injunction against withholding agency records and an affirmative order to produce such records improperly withheld. I would hold, under the doctrine as stated by Mr. Justice Brandeis, that these remedies are exclusive; that no jurisdiction to grant any other remedy was conferred on the District Courts by Congress; and that these District Courts were accordingly without jurisdiction to enjoin the proceedings before the Renegotiation Board.II
 
 
 70
 Were I not convinced that the simple rules of law cited in Part I are wholly conclusive on the issue of jurisdiction, I would still fail to be swayed by the tenuous argument of the majority that jurisdiction can properly be implied from the legislative history of this statute.
 
 
 71
 At page 352 the majority concedes "that Congress was principally interested in opening administrative processes to the scrutiny of the press and general public when it passed the Information Act." However the majority then points to two sentences in the Senate Report, and the subsection of the Act to which they referred, to demonstrate a "subsidiary statutory purpose" to "prevent a citizen from losing a controversy with an agency" because of "secret laws or incomplete information."
 
 
 72
 To begin, the concern over "incomplete information" is gratuitously added by the majority opinion, for the Senate Report makes it clear that the subsection involved, 5 U.S.C. Sec. 552(a)(2),
 
 
 73
 deals with agency opinions, orders and rules. . . .
 
 
 74
 Apart from the exemptions, agencies must make available for public inspection and copying all final opinions (including concurring and dissenting opinions); all orders made in the adjudication of cases; and those statements of policy and interpretations which have been adopted by the agency and are not required to be published in the Federal Register; and administrative staff manuals and instructions that affect any member of the public.
 
 
 75
 Sen.Rep.No.813, 89th Cong., 1st Sess. 6-7 (1965). The House Report contributes this additional explanation:
 
 
 76
 This material is the end product of Federal administration. It has the force and effect of law in most cases, yet under the present statute these Federal agency decisions have been kept secret from the members of the public affected by the decisions.
 
 
 77
 H.R.Rep.No.1497, 89th Cong., 1st Sess. 7 (1965). Thus this section of the Act, and the Reports, is solely concerned with the existence of "secret law" rather than any "incomplete information" that might be useful to a citizen involved in controversy with an agency. Furthermore, though publication and indexing of such "secret laws" will inevitably benefit potential litigants, it seems to me that this benefit is incidental to the statute's central purpose of ensuring that such important "case law" of the Federal administrative "bureaucracy" (House Report at 7) will be readily accessible to all members of the public regardless of their special need. In the context of the Act, the evil of "secret law" is its secrecy-the very notion of the Federal Government operating behind closed doors away from public examination and scrutiny-rather than any detrimental impact on potential litigants before the agencies.
 
 
 78
 I have searched the legislative history of the Act in vain for any other suggestion that Congress had any special interest in or concern with litigants before the administrative agencies. The entire thrust of that history points to the congressional intent to make all but the specifically exempted information available to any member of the public without requiring any showing of need therefor. In these two sentences from the Senate Report the majority picks too slender a reed on which to support an argument to the contrary. The jurisdiction of the federal courts must rest on more substantial grounds, i. e., "express provisions of the federal statutes." Barron & Holtzoff, supra.
 
 III
 
 79
 I am similarly unconvinced that the cases and doctrines cited by analogy in the majority opinion lead to the conclusion that jurisdiction should be found here.
 
 
 80
 Pointing to the traditionally broad powers of equity, the majority cites three cases for the proposition that when Congress confers equitable jurisdiction upon a court that jurisdiction should be construed to encompass the traditional breadth of the equity power. None of the three cases, however, support so broad a proposition for these cases. In Mitchell v. Robert DeMario Jewelry, Inc., 361 U.S. 288, 291-292, 80 S.Ct. 332, 335, 4 L.Ed.2d 323 (1960), the Court's expression of this proposition contains an express limitation:
 
 
 81
 When Congress entrusts to an equity court the enforcement of prohibitions contained in a regulatory enactment, it must be taken to have acted cognizant of the historic power of equity to provide complete relief in the light of the statutory purposes. [Emphasis added.]
 
 
 82
 The statutory purpose here was limited to providing public access to governmental information without regard to need and the statutory remedies were intended to aid in the accomplishment of that statutory purpose. The "complete relief" accorded by the majority is relief allegedly made necessary by the special needs of the appellees-a basis for relief to which the remedies of the Information Act were not addressed. In such circumstances, litigants with special needs constitute a class of persons that the remedies of the Information Act did not intend to accommodate; and the court has no power to expand the Act by judicial fiat to serve a purpose that is beyond "the statutory purposes."
 
 
 83
 The other two cases, Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944) and Porter v. Warner Holding Co., 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946), both involved the same statute, Section 205(a) of the Emergency Price Control Act of 1942, and the issue of whether equitable remedies other than those specifically stated in the statute could be awarded. The Court in both cases answered that question in the affirmative, but based this finding upon an expansive provision of the statute. The following language from Porter is critical:
 
 
 84
 Indeed, the language of Sec. 205(a) admits of no other conclusion. . . . [I]t expressly authorizes the District Court, upon a proper showing, to grant "a permanent or temporary injunction, restraining order, or other order." As recognized in Hecht Co. v. Bowles, supra, 328, [64 S.Ct. 591,] the term "other order" contemplates a remedy other than that of an injunction or restraining order, a remedy entered in the exercise of the District Court's equitable discretion.
 
 
 85
 ******
 
 
 86
 * * *
 
 
 87
 . . . . This is not a situation where a statute has created a right and has provided a special and exclusive remedy, thereby negativing any jurisdiction that might otherwise be asserted. United States v. Babcock, 250 U.S. 328, [39 S.Ct. 464, 63 L.Ed. 1011.]
 
 
 88
 328 U.S. at 399, 403, 66 S.Ct. at 1089, 1091 (emphasis added). Here, of course, there is no phrase similar to "or other order" that would indicate a congressional intent to make the special remedies of the Act nonexclusive.
 
 
 89
 The majority's cases supporting "the inherent authority to preserve the status quo pending a judicial review of the merits" are also inapposite. All of these cases involve stays of administrative proceedings pending judicial determination of matters preliminarily decided therein. Here, though the appellees intend to use the information they would obtain in this Information Act suit to aid them in their proceedings before the Renegotiation Board, this suit is entirely collateral to those administrative proceedings. The majority has not cited, nor am I aware of, any judicial decision in which a civil suit seeking enforcement of a statutory right wholly independent of and unrelated to any issues involved in an ongoing administrative proceeding has resulted in an order in the course of that litigation staying or otherwise interfering with the agency's proceedings.
 
 
 90
 Finally, in view of the many cases (cited by the majority at page 353) finding an express congressional intent that equitable considerations should not upset the legislative judgment that all but specifically exempted information must be provided under the Act, I consider that our statement in Soucie v. David, supra, 145 U.S.App.D.C. at 154, 448 F.2d at 1077, can be appropriately paraphrased as follows:
 
 
 91
 Since judicial use of traditional equitable principles to compel disclosure would upset this legislative resolution of conflicting interests, we are pursuaded that Congress did not intend to confer on district courts a general power to deny relief on equitable grounds apart from the exemptions in the Act itself.
 
 
 92
 In this line of cases agencies unsuccessfully sought to withhold information, other than that within the Act's specific exemptions, on the basis of traditional equitable concepts of relative need or hardship. Here, the appellees seek to obtain a remedy, other than those specified in the Act, on the basis of traditional equitable concepts of need or hardship. I see no basis for our treating the two situations differently.
 
 IV
 
 93
 While I believe that these cases should properly have been disposed of on jurisdictional grounds, I also find the majority's disposition of the exhaustion issue to be incorrect. In Sterling Drug Inc. v. FTC, 146 U.S.App.D.C. 237, 450 F.2d 698 (1971), Sterling sought the production of documents from the FTC during the course of administrative proceedings challenging their acquisition of another company. The complaint in that suit was framed in two separate, alternative, claims-one under the Information Act seeking the relief specifically provided therein, and the other under the Due Process clause of the Constitution seeking an injunction against continuing the administrative procedures. The same information was sought under both claims, but while we granted the Information Act claim and ordered production of the documents we found that the doctrine of exhaustion of remedies barred an injunction to stay continuance of the administrative proceedings.
 
 
 94
 The only difference I find between Sterling Drug and the present cases is that here the pleadings have been altered to request both forms of relief in the same claim rather than in the alternative. I simply do not consider this difference significant enough, particularly in our procedure under the Federal Rules, to warrant the dramatically different result the majority has ordered here. Their ingenious attempt to distinguish Sterling Drug, on the ground that here the claim to entitlement is based on the Information Act and no administrative remedy exists within the Renegotiation Board's procedures for litigating that claim, is wholly unconvincing. Appellees may not have cast their pleadings in terms of a violation of due process before the agency, but all of their allegations of irreparable injury without adequate legal remedy (which the majority finds determinative on the exhaustion issue) can properly be interpreted only as a complaint that by refusing to provide the requested documents the Board has prejudiced their rights to a fair renegotiation.
 
 
 95
 By failing to recognize the essentially "due process" nature of the appellees' allegations of injury, the majority have become trapped in a seductive, but incorrect, syllogism that proceeds as follows: (1) Appellees have a nonfrivolous claim of entitlement to the documents under the Information Act; (2) Possession of these documents would significantly enhance appellees' opportunity to negotiate the most favorable possible settlement early in the renegotiation proceedings; (3) The Renegotiation Board is without jurisdiction to consider the claim of entitlement to the documents under the Information Act and will continue the renegotiation proceedings without resolving that claim or providing the documents; therefore (4) Having shown a nonfrivolous claim of entitlement to the documents, and an injury caused by the lack of information that cannot be corrected in the administrative proceedings, the Board must be enjoined from proceeding until that claim is resolved. The error in this syllogism is at step two, and is reflected by the majority's acquiescence, at page 356, in the appellees' contention "that the administrative process cannot function as it was intended to function until they are given access to the documents." This position seriously misconstrues the intended functioning of the Renegotiation Board's procedures-controlled access to information concerning the Government's position in the negotiations plays a significant role in the administrative process before the Board.
 
 
 96
 The majority correctly notes in their review of the Renegotiation Act, at page 350, that "[t]he Act's legislative history . . . make[s] clear that Congress preferred negotiation to confrontation." Indeed, Congress explicitly omitted the trappings of formal procedural due process, with its opportunities for discovery of evidence and confrontation of adverse parties from the Board's procedures. Lichter v. United States, 334 U.S. 742, 791-792, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948). But while noting these facts, the majority seems to ignore one of the critical aspects of negotiation that sets it apart from litigation as a device for resolving disputes: the skillful negotiator carefully guards and controls his adversary's access to the critical bits of information that would reveal the strengths or weaknesses of his bargaining position.
 
 
 97
 The regulations describing the Board's procedures reflect this characteristic approach to the release of information in negotiation. Indeed, the "seemingly endless de novo reviews" that the majority consider are intended to coerce settlement at lower levels of the administrative machinery by making appeals more risky, instead reflect the recognition that neither party to the renegotiation is to be bound by or limited to the information he revealed at the previous step. The de novo reviews permit the continuous introduction of new information and shifting bargaining positions as the contractors and the Government negotiate their way toward a final settlement. In the context of this negotiation procedure, the regulations are quite explicit concerning the timing and content of the Government's release of statements regarding the facts and rationale on which they have relied at each stage of the administrative process. 32 C.F.R. Secs. 1472.3(f), 1477.2, 1477.3.
 
 
 98
 The appellees here seek to force the Board to reveal their hand-to provide the contractors with information critical to the Government's bargaining position at earlier stages of the renegotiation process than provided for in the regulations. While the Information Act may entitle them to some of the information they seek, such an interpretation of the Information Act may overbalance the scales of the Renegotiation Act in favor of the contractors. What I resist in the majority's treatment of the exhaustion issue is their failure to recognize that by interrupting the administrative proceedings while Information Act claims are being resolved in collateral judicial proceedings they have totally destroyed the balance of negotiating strength that Congress intended to exist under the Renegotiation Act.
 
 
 99
 In brief, the irreparable injury urged by these appellees as the source of their right to injunctive relief is a temporary condition that was carefully and intentionally imbedded in the structure of the renegotiation procedures-the timing of the Government's release of information concerning their bargaining position. Because this is so, the essence of the appellees' attempt to enjoin the ongoing renegotiations is a challenge to the Board's procedures themselves. In this respect the present cases are indistinguishable from Lichter v. United States, supra, Aircraft & Diesel Equipment Corp. v. Hirsch, 331 U.S. 752, 67 S.Ct. 1493, 91 L.Ed. 1796 (1947), and Macauley v. Waterman Steamship Corp., 327 U.S. 540, 66 S.Ct. 712, 90 L.Ed. 839 (1946). The holding of each of these cases is that the doctrine of exhaustion of remedies bars an injunction against ongoing Board proceedings while judicially testing those procedures.
 
 V
 
 100
 An interesting postscript to the majority's discussion of the adequacy of alternative legal remedies is provided by the recent decision of the Court of Claims in Lykes Bros. Steamship Co. v. United States, 459 F.2d 1393 (1972). The Court of Claims replaced the United States Tax Court as the forum for review of "final determinations" of the Renegotiation Board on July 1, 1971. One of the reasons given in the legislative history for this transfer of jurisdiction was that the Court of Claims is procedurally more suitable for handling renegotiation cases than the Tax Court. H.R.Rep.No.92-235, 92d Cong., 1st Sess. 6 (1971). Lykes is the first renegotiation case to have been decided in the Court of Claims since the transfer, and the congressional prophecy seems about to be fulfilled. In Lykes the Tax Court's former presumption of the validity of the Board's determination was reversed, and the burden of proof concerning the existence and extent of excess profits was shifted to the Government. Perhaps more significantly in the context of our cases here, the burden of going forward with evidence with regard to the statutory factors on which the contractor relies in his argument against an excess profit finding remains with the contractor, but only
 
 
 101
 to the extent that the facts pertaining thereto are within its knowledge or possession, are accessible to the public generally in the form of published reports, or are actually made available to the contractor by the Government, voluntarily through a request made in pre-trial proceedings, by discovery under the rules of the court, or pursuant to the Freedom of Information Act, 5 U.S.C. Sec. 552.
 
 
 102
 459 F.2d at 1401 (emphasis in original).
 
 
 103
 I believe Lykes amply demonstrates the adequacy of the statutory procedures for protecting the rights of contractors engaged in renegotiation, at least to the extent of considering those procedures sufficiently adequate as to require their exhaustion instead of granting the injunctions here. The majority, in my opinion, unnecessarily and impermissibly allows the District Courts to interrupt the renegotiation process while determining a wholly collateral matter under a separate and unrelated statute.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. Sec. 294(c) (1970)
 
 
 [1]
 But see Sears, Roebuck & Co. v. NLRB, 6 Cir., 433 F.2d 210 (1970). Cf. Sterling Drug Inc. v. FTC, 146 U.S.App.D.C. 237, 450 F.2d 698 (1971). In Grumman Corp. v. Renegotiation Board, D.C.Cir., No. 24,726 (Oct. 27, 1970), we dismissed without opinion an appeal from the District Court's refusal to grant a temporary restraining order on facts similar to those in these cases. However, denial of a temporary restraining order is generally not appealable. See, e. g., Woods v. Wright, 5 Cir., 334 F.2d 369, 373 (1964)
 
 
 [2]
 In one of the cases, Astro Communications Laboratory v. Renegotiation Board, the District Judge ordered production of the documents for in camera inspection so he could evaluate the force of the Board's arguments. Cf. Soucie v. David, 145 U.S.App.D.C. 144, 156, 448 F.2d 1067, 1079 (1971). The Board's appeal from that order was consolidated with these cases for argument, but we remanded the issue to the District Court without reaching the merits since the order was interlocutory in nature and had not been certified for appeal by the District Judge. See 28 U.S.C. Sec. 1292(b) (1970)
 
 
 [3]
 While the Act nowhere defines the term "excessive profits" beyond the conclusory statement that "[t]he term 'excessive profits' means the portion of the profits derived from contracts * * * which is determined in accordance with this title * * * to be excessive," 50 U.S.C.App. Sec. 1213(e), it does set forth, albeit in rather general terms, a series of criteria which the Board is required to consider in determining the reasonableness of profits. See 50 U.S.C.App. Sec. 1213(e) (1)-(6). Perhaps unavoidably, the Board's regulations do little to narrow the extremely broad discretion with which the Act vests the Board in the first instance. See 32 C.F.R. Sec. 1460.8 (1972). ("Reasonable profits will be determined in every case by overall evaluation of the particular factors present and not by the application of any fixed formula with respect to rate of profit, or otherwise.")
 
 
 [4]
 Thus, according to Board figures, approximately 88% of its cases are ended by voluntary agreement, while coercive orders are entered in only the remaining 12%. Fifteenth Annual Report of the Renegotiation Board 13 (1970)
 
 
 [5]
 See, e. g., Senate Report No. 813, 89th Cong., 1st Sess., 3 (1965) (hereinafter cited as "Senate Report"):
 "Although the theory of an informed electorate is vital to the proper operation of a democracy, there is nowhere in our present law a statute which affirmatively provides for that information. Many witnesses have testified that the present public information section of the Administrative Procedure Act has been used more as an excuse for withholding than as a disclosure statute." See also House Report No. 1497, 89th Cong., 2d Sess., 2-3 (1966) (hereinafter cited as "House Report").
 
 
 [6]
 Thus, whereas the old Sec. 3 of the Administrative Procedure Act required a person requesting disclosure to show that he was "properly and directly concerned," the Freedom of Information Act mandates disclosure to "any person." Compare 5 U.S.C. Sec. 1002(c) (1964) with 5 U.S.C. Sec. 522(a)(3) (1970)
 
 
 [7]
 A highly abridged listing of cases in which federal courts have reached the merits or stayed administrative proceedings despite the existence of unexhausted administrative remedies follows: McKart v. United States, 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969); Damico v. California, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967); McCulloch v. Sociedad Nacional de Marineros de Honduras, 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963); Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958); Public Utilities Comm'n of California v. United States, 355 U.S. 534, 78 S.Ct. 446, 2 L.Ed.2d 470 (1958); Allen v. Grand Central Aircraft Co., 347 U.S. 535, 74 S.Ct. 745, 98 L.Ed. 933 (1954); Robertson v. Chambers, 341 U.S. 37, 71 S.Ct. 547, 95 L.Ed. 726 (1951); United States Alkali Export Assn v. United States, 325 U.S. 196, 65 S.Ct. 1120, 89 L.Ed. 1554 (1945); Public Utilities Comm'n of Ohio v. United Fuel Gas Co., 317 U.S. 456, 63 S.Ct. 369, 87 L.Ed. 396 (1943); Utah Fuel Co. v. National Bituminous Coal Comm'n, 306 U.S. 56, 59 S.Ct. 409, 83 L.Ed. 483 (1939); Smith v. Illinois Bell Telephone Co., 270 U.S. 587, 46 S.Ct. 408, 70 L.Ed. 747 (1926); United States ex rel. Kansas City Southern Ry Co. v. ICC, 252 U.S. 178, 40 S.Ct. 187, 64 L.Ed. 517 (1920); Murray v. Kunzig, 149 U.S.App.D.C. 256, 462 F. 2d 871 (1972); Jewel Companies, Inc. v. FTC, 7 Cir., 432 F.2d 1155 (1970); Elmo Division of Drive-X Co. v. Dixon, 121 U.S.App.D.C. 113, 348 F.2d 342 (1965); Amos Treat & Co. v. SEC, 113 U.S.App.D.C. 100, 306 F.2d 260 (1962)
 
 
 [8]
 See, e. g., Petroleum Exploration, Inc. v. Public Service Comm'n, 304 U.S. 209, 58 S.Ct. 834, 82 L.Ed. 1294 (1938); Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938); Sterling Drug Inc. v. FTC, supra note 1; Frito-Lay, Inc. v. FTC, 5 Cir., 380 F.2d 8 (1967); Sohm v. Fowler, 124 U.S.App.D.C. 382, 365 F.2d 915 (1966); Lone Star Cement Corp. v. FTC, 9 Cir., 339 F.2d 505 (1964); Chicago Automobile Trade Assn v. Madden, 7 Cir., 328 F.2d 766 (1964); SEC v. R. A. Holman & Co., Inc., 116 U.S. App.D.C. 279, 323 F.2d 284, cert. denied, 375 U.S. 943, 84 S.Ct. 350, 11 L.Ed.2d 274 (1963); Texaco, Inc. v. FTC, 5 Cir., 301 F.2d 662, cert. denied, 371 U.S. 822, 83 S.Ct. 40, 9 L.Ed.2d 62 (1962); Virginia Petroleum Jobbers Assn v. FPC, 104 U.S.App.D.C. 106, 259 F.2d 921 (1958)
 
 
 [9]
 In one sense, of course, the inadequate remedy requirement is indistinguishable from the irreparable injury requirement. The very thing which makes an injury "irreparable" is the fact that no remedy exists to repair it. As used above, however, the irreparable injury rubric is intended to describe the quality or severity of the harm necessary to trigger equitable intervention. In contrast, the inadequate remedy test looks to the possibilities of alternative modes of relief, however serious the initial injury
 
 
 [10]
 Sterling Drug can also be distinguished on the ground that in that case a delay in assumption of jurisdiction was necessary to avoid decision on a possibly difficult constitutional question. If at some later stage of the Sterling Drug case the Commission had ruled for the company on statutory grounds, the procedural due process question might have been permanently avoided. Cf. Aircraft & Diesel Equipment Corp. v. Hirsch, 331 U.S. 752, 772, 67 S.Ct. 1493, 91 L.Ed. 1796 (1947); Sohm v. Fowler, supra note 8, 124 U.S. App.D.C. at 385, 365 F.2d at 918. There is no analogous maxim which requires courts to avoid questions concerning the Freedom of Information Act, however. On the contrary, the Act directs the District Court to decide questions arising under it as quickly as possible. See 5 U.S.C. Sec. 552(a) (3). Nor, in any event, could this question be avoided by allowing the administrative process to go forward. Since the Freedom of Information Act guarantees access to documents regardless of need, see text at note 6 supra, appellees would be entitled to a judicial declaration as to the status of these documents even if they prevailed before the Renegotiation Board without them
 
 
 [11]
 Thus in the section of its opinion entitled "Sterling's Claim Under the Freedom of Information Act," the court makes no reference to possible exhaustion problems and proceeds to decide Sterling's claims on the merits. See 146 U.S.App. D.C. at 242-249, 450 F.2d at 703-710. It is only when the court comes to the section dealing with "Sterling's Claim of Denial of a Fair Hearing" that the effort to enjoin the Commission is discussed. See 146 U.S.App.D.C. at 249-251, 450 F.2d at 710-712
 
 
 [12]
 We note in this regard that the Renegotiation Act places a 2-year time limit on the renegotiation process, and that if a final order is not entered within that time the contractor's liability is discharged. See 50 U.S.C.A.App. Sec. 1215 (c) (1972 pocket part). In these cases the contractors agreed to suspend the 2-year limitation while their Freedom of Information Act claims were sub judice. In the future the District Court should, when appropriate, condition granting of a preliminary injunction on the contracttor's willingness to agree to a similar suspension