The **PORT OF NEW YORK AUTHOR-ITY**, Plaintiff,

v.

**EASTERN AIR LINES, INC.**, Trans World Airlines, Inc., and United Air Lines, Inc., Defendants.

No. 66–C–867.

United States District Court E. D. New York.

Oct. 11, 1966.

See also 259 F.Supp. 142.

Sidney Goldstein, New York City, for plaintiff; Joseph Lesser, Isobel E. Muirhead, New York City, of counsel.

Cleary, Gottlieb, Steen & Hamilton, New York City, for defendant United Air Lines, Inc.; Fowler Hamilton, George Weisz, New York City, of counsel.

BARTELS, District Judge.

The Port of New York Authority, a citizen of New York, commenced this action in the Supreme Court of the State of New York against Eastern Air Lines, Inc. (Eastern), Trans World Airlines, Inc. (TWA), and United Air Lines, Inc. (United), seeking a permanent injunction against each defendant from violating certain agreements, rules and regulations adopted by Port Authority relative to the use by jet airplanes of runways 22 and 4 at LaGuardia Airport, upon the ground that the unauthorized use of said runways by the airlines constituted trespasses against Port Authority property, and that such trespasses should be enjoined.

On August 25, 1966 a temporary restraining order was granted by the State court *ex parte* which, pursuant to a stipulation, has been extended against Eastern and TWA until November 15, 1966, after which date the whole question will become moot because the Port Authority has agreed to voluntarily discontinue the action against the defendants on November 16, 1966, and to permit the use by jets of said runways 4–22. United did not agree to the stipulation and on September 7, 1966 properly removed the case to this Court in compliance with 28 U.S.C.A. § 1441(c). Port Authority now moves, pursuant to Rule 65, Fed.Rules Civ.Proc., 28 U.S.C.A., for a preliminary injunction to restrain United from using jet airplanes to take off on said runway 22 or to land on runway 4. Predicated upon the pleadings, affidavits, arguments and briefs, the material facts appear to be as follows:

Port Authority was created under compact between the States of New York and New Jersey, with the consent of the United States Congress, with full powers for the development and operation of terminal and transportation facilities in the Port of New York District, and pursuant to concurrent legislation supplemental thereto [1] was authorized to effectuate, maintain and operate air terminals within said district, including La Guardia Airport which it leased from the City of New York for a term beginning June 1, 1947 and ending December 31, 2015. Section 4 of said legislation provides that the Port Authority shall be regarded as performing an essential governmental function in connection with the maintenance and operation of its air terminals, and Section 10 of the same legislation provides that all details of the operation of the airports are within the sole discretion of the Port Authority and that its decisions in connection therewith are to be controlling and conclusive.

1. Chapter 802 of the Laws of New York, 1947, as amended by Chapter 785 of the Laws of New York, 1948, McKinney's Unconsolidated Laws of New York, § 6631 et seq., and Chapter 43 of the Laws of New Jersey, 1947, as amended by Chapter 214 of the Laws of New Jersey, 1948, N.J.S.A. 32:1–35.1 et seq.

On October 6, 1955, the Port Authority as operator of the airports, adopted a revised set of rules and regulations, including a rule prohibiting the use of any airport by jet aircraft without permission,[2] and another rule [3] providing that any permission granted by the Port Authority to an aircraft operator to enter upon or use any terminal "is conditioned upon compliance with the Port Authority rules and regulations; and entry upon or into any air terminal by any person shall be deemed to constitute an agreement by such person to comply with said rules and regulations * * *". Pursuant to a lease between United and Port Authority, executed February, 1964 as of January 1, 1957, and in effect during the period herein involved, covering the use by United of the airport's facilities, United agreed, among other things, "to observe and obey all rules and regulations which may from time to time during the term hereof be promulgated and enforced by the Port Authority * * * ".[4]

On July 24, 1962 and again on May 31, 1963, Port Authority entered into certian Grant-in-aid Agreements with the United States of America (acting through the Federal Aviation Agency), which agreed upon certain terms and conditions to pay 50% of the cost of extending runways 4–22 and runways 13–31 at LaGuardia to a length which would safely accommodate jet aircraft for landings and take-offs in either direction upon both such runways.[5]

On April 9, 1964, prior to the extension of both runways to 7,000 feet, United (as well as the other airlines) requested permission of the Port Authority to operate its jet aircraft in landings on runways 13, 31 and 22 and in take-offs on runways 31, 13 and 4, asserting that " * * * Prior to the extension of the runways, we do not propose to conduct 727 landings on Runway 4 and 727 take-offs on Runway 22 unless the Port Authority and ourselves have agreed that the operations can be conducted on this runway at tolerable noise levels." Thereafter, on April 22, 1964, Port Authority, by letter, granted each airline such permission upon certain terms and conditions including a condition that take-offs on these runways would be permitted "only if they are so planned and conducted at the airport that the noise level of 112 PNdb as measured on the ground in the communities underlying the flight path after take-off will not be exceeded."

For a period of two years thereafter none of the airlines conducted its jet aircraft operations using runway 4 for landings or runway 22 for take-offs. In the spring of 1966 all of the construction work and improvements for the extension of runways 4–22 contemplated by the two Grant Agreements were completed so that jet aircraft could safely land or take-off thereon in either direction. However, the construction work and improvements on runways 13–31 were not completed at that time and apparently will not be completed until on or about November 16, 1966, at which time both runways will be available by the Port Authority for landings and take-offs in either direction.

Under the Federal Aviation Act of 1958 (49 U.S.C.A. §§ 1301 et seq.) Congress declared that the public has the right of freedom of transport through

2. Rule 15, Section II, Port Authority's Rules and Regulations for Air Terminals, as revised April 1, 1966.

3. Rule 2, Section I of above.

4. Section 22 of said lease.

5. In both Grant Agreements the Port Authority agreed that the extensions were for the purpose of accommodating jet aircraft operations and that it recognized its obligations to meet the aeronautical needs of the communities served, including the use of said runways, provided the agreement was not to be construed "to abrogate or curtail the Port Authority's power as airport operator to adopt and enforce reasonable rules and regulations * * * ". In each project application it was agreed that the Port Authority could establish fair and equal conditions to be met by all users of the airport as may be necessary for the efficient operation of the airport.

navigable air space of the United States and authorized the Federal Aviation Administrator to prescribe air traffic rules and regulations governing the flight of aircraft for the protection of aircraft and persons and property on the ground, including rules for safe altitudes of flight and for the assignment of the use of air space on such terms and conditions as may be necessary to insure the safety of aircraft. Pursuant to this authority the Federal Aviation Administrator adopted certain rules and regulations prescribing flight paths, traffic patterns, runway utilization, and landing and take-off procedures in connection with aircraft operations at LaGuardia Airport (Federal Aviation Regulations, §§ 91.1 et seq., 93.31 et seq. and 97.1 et seq.) and also establishing certain preferential runway systems for airports with operating control towers and providing that no pilot shall take off or land without clearance from the FAA control towers [§ 91.87(h)]. The regulations further provide that each pilot assigned a preferential runway must use that runway unless, in the interest of safety, the pilot should determine that another runway should be used, in which event he must again receive clearance from the FAA Air Traffic Control Tower [§ 91.87 (g)].

On October 8, 1962 the Federal Aviation Administrator gave notice to all air men ("NOTAM") prohibiting jet aircraft from taking-off on runway 22 or landing on runway 4 at LaGuardia Airport. In July, 1966 the Federal Aviation Administrator issued a Tower Bulletin (T.B. No. 66–5), effective August 8, 1966, rescinding this prior NOTAM and establishing a preferential runway system for LaGuardia Airport requiring each pilot to use the preferential runway assigned to him by the FAA Air Traffic Control Tower unless, in the interest of safety, the pilot requested and obtained a different clearance. The purpose of the bulletin, as described therein, was "To describe the preferential runway system and noise abatement procedures established for LaGuardia Airport." In

listing the priorities with respect to the use of runways, take-offs on 22 and landings on 4 were designated as number 3 or the last priority. The bulletin further provided that preferential runways would not be assigned under certain adverse conditions "or when the reported surface wind is in excess of a 15 knot crosswind component."

On July 27, 1966, apparently after the issuance of Tower Bulletin No. 66–5, the Port Authority, by letter, notified United and the other defendants that the Port Authority had not given permission to use runways 4–22, that the rules and regulations of the Port Authority and the terms of the agreement of the Port Authority with United concerning the use of those runways were still in effect, and that should the FAA Control Tower designate runway 4 for jet landings, or runway 22 for jet take-offs, as the preferential runways, such landings and take-offs would still violate said rules and regulations and said agreements with the Port Authority, and the letter further stated that at a meeting on November 24, 1964, at which Oscar Bakke, Eastern Regional Director of FAA, was present, the Borough President of Queens was advised at that time that "on behalf of the airlines, the FAA and the Port Authority, that the ultimate future use of the runways involving relatively few approaches and take-offs over Jackson Heights was dependent on lengthening both 13–31 and 4–22 to 7,000 feet. The extension of 13–31 to 7,000 feet will be completed on or about November 1, 1966." On August 5, 1966, the Metropolitan Airlines Committee (representing all the defendants) notified the Port Authority, by letter, that they had "serious reservations" about the viewpoints expressed in the Port Authority July 27, 1966 letter, but emphasized that their members were "vitally interested in abating aircraft noise" and would not land on runway 4 or take-off on runway 22 "except when FAA procedures and safety considerations dictate such action".

On August 11, 1966, in reply to a letter of August 1, 1966 from the Port Authority, the FAA wrote in part: "The crux of our differences boils down to whether the Federal Aviation Agency will refuse jet operations on a runway at an airport when safety considerations indicate its use" and that the agreements entered into between the Port Authority and the airlines were not binding on the Federal Government, and that the "Agency cannot be expected to enforce private agreements in such circumstances; they remain a matter between the Port and the airlines only." The letter further stated that "We want to make it clear that in making the runway available for the fullest use required by safety considerations we are *not directing* that the runway be used. If, despite the action of the Agency cancelling the NOTAM, the Port and the airlines decide to continue their agreements to restrict the use of runways 4–22, the airlines will be required to abide by other applicable Federal Aviation Regulations. Thus, when wind and weather conditions require the use of 4–22, airlines will have the option of diverting to another airport. In this event, the Agency would have to consider what remedies are available under the FAAP agreement." (Emphasis supplied).

Thereafter, on August 20, 1966, one defendant landed a jet aircraft on runway 4, and on or about August 23, 1966 a jet aircraft of each defendant took off on runway 22 after receiving clearance from the FAA Air Traffic Control Tower but without the permission of the Port Authority. Thereupon the Port Authority applied for and obtained from the State court the temporary restraining order referred to earlier.

Before proceeding to the crucial issues here involved, it is appropriate to dispose of certain contentions advanced by United, which the Court believes are without merit.

■ United claims as a second affirmative defense that it is a third-party beneficiary of the two Grant Agreements between the Port Authority and the United States of America, dated July 24, 1962 and May 31, 1963, respectively, as supplemented by Port Authority's assurances given in connection therewith, and that these agreements and assurances have been breached by the Port Authority by imposing restrictions on the use of runways 4–22, thus creating a cause of action and a defense enforceable by United. Without passing upon whether there has been a breach of these agreements, it is sufficient to point out that there is nothing in the Federal Airport Act of 1946 and the Grant Agreements and sponsor's assurances indicating in any way an intent to abridge the right of Port Authority to regulate its airports. These agreements were not made expressly for the benefit of the airlines and there is no provision in the Airport Act or in the Grant Agreements creating any legal right in the airlines to enforce the same in case of breach. See, City and County of San Francisco v. Western Airlines, Inc., 204 Cal.App.2d 105, 22 Cal.Rptr. 216, 1962, and Eastern Airlines, Inc. v. Town of Islip, 1962, Sup., 229 N.Y.S.2d 117.

■■ United also contends that the Port Authority is not entitled to prevail unless it establishes not only that (i) United has wrongfully invaded a clear legal right belonging to the Port Authority, but also that (ii) Port Authority will suffer irreparable injury, loss or damage by reason thereof. It was assumed that failure on the part of Port Authority to sustain the burden described in (ii) above would result in a defeat of its application and accordingly it was agreed to grant priority to this issue in order to eliminate the possible necessity of considering the other issues. However, as hereafter revealed, in a case involving a claim of illegal use of real property in violation of a restrictive covenant in the terms of a lease, license or other agreement, it is unnecessary for the plaintiff to establish irreparable damage or loss if, in fact, he can demonstrate that his remedy at law is inadequate. Such is true in this case where

the Port Authority, if it establishes the invasion of its legal rights, will have no other remedy except injunctive relief. Consequently, the issues will be considered in their normal order.

Despite the multiplicity of arguments advanced by both parties, the essential issues in this case may be reduced to the following: (1) Were the rules and regulations (regulations) of the Port Authority, as implemented by the agreement in the correspondence between the parties affecting the use by jet aircraft of runways 4–22,[6] reasonable? (2) Did such regulations, as so implemented, conflict or interfere with the FAA right to control air traffic into and out of LaGuardia Airport? and (3) Did United by using runways 4–22 on August 20th and August 23rd, 1966, and by thereafter threatening such use, violate such regulations as so implemented, and if so, is the Port Authority entitled to injunctive relief without a showing of irreparable damage or loss?

### Reasonableness of the Port Authority's Regulations

From the basic facts, including the pertinent regulations of the Port Authority, the lease, and the exchange of letters between the parties dated April 9, 1964, April 22, 1964, July 27, 1966, and August 5, 1966, as delineated above, it conclusively appears that United, as well as the other airlines, agreed to abide by the regulations of the Port Authority[7] not to use runways 4–22 for jet aircraft operations prior to the extension of both runways 4–22 and runways 13–31. In fact, Port Authority's permission to operate jet aircraft on runways 4–22 and runways 13–31 was predicated upon this express condition. United claims that it agreed to be bound only by reasonable regulations and that the regulations and agreements between the parties have now become unreasonable since runways 4–22 are completed and safe for use and there is no longer any

reason to await the completion of runways 13–31 before permitting the use of aircraft operations on runways 4–22. "Reasonableness" is an elastic term and can only be appraised in the light of the particular circumstances of each case. When dealing with a quasi-public corporation charged with the duty of operating and managing a number of airports in the public interest and for the benefit of the entire public, including residents of the neighboring communities as well as the airlines, any doubt as to the reasonableness of its regulations should be resolved in its favor.

By reason of its specialized experience and expertise, the Port Authority is uniquely equipped to weigh the various conflicting interests and to resolve the same by the adoption of regulations which it believes to be reasonable. In so doing its judgment is not affected by any special or personal interest. It is not for the Court to substitute its judgment for that of the Port Authority or decide what regulations should be adopted. Its function is only to determine, in the light of all the circumstances, whether the particular regulation is so unreasonable as to violate the understanding between the parties. At the time the regulation was adopted and agreed to, United and the other airlines obviously recognized that it was reasonable. Since, however, runways 4–22 are completed and safe to use, United is unwilling to await the completion of runways 13–31 as agreed but now contends that the picture has changed and that the regulation restricting the use by jet aircraft of runways 4–22 until runways 13–31 are also completed, is unreasonable. The Court is not persuaded by this argument. It is convinced that under the circumstances the regulations, as adopted by the Port Authority and agreed to, are still reasonable because (i) they will substantially abate the jet aircraft noise in the Jackson Heights area until the completion of runways 13–

---

**6.** In identifying runways 4–22, reference is made to landings on runway 4 and take-offs on runway 22.

**7.** There is no question that Port Authority has power to make such regulations.

31, which noise abatement is the subject of serious concern to both the Port Authority and the FAA [8]; (ii) the restriction upon United's jet aircraft operations on runways 4–22 would hinder operations at LaGuardia only for an average of 9% of the time during which it would be permitted to use said runways 4–22 under the preferential assignment set forth in Tower Bulletin 66–5 (affidavit of Oscar Bakke); (iii) the restriction on United's use of runways 4–22 would be limited to approximately seven weeks, and (iv) the Port Authority would make available at Kennedy or Newark Airport, as the case may be, appropriate and safe runways for United jet landings and take-offs if the same are prevented at LaGuardia Airport by crosswinds and the prohibition by the Port Authority regulations to use runways 4–22. Cf., Williamson v. Lee Optical of Oklahoma, 1955, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563.

The reasonableness of the regulation finds some support from the fact that the other airlines have agreed to the extension of the State court temporary restraining order until November 16, 1966, and from the further fact that United as well as the other airlines originally agreed to await the completion of runways 13–31 before using runways 4–22 for jet operations.

*Port Authority's regulations do not conflict or interfere with the authority of the FAA to control air traffic.*

██ United also attacks the validity of the Port Authority's regulations and its own agreements on the ground that they interfere and conflict with the authority of the FAA to control air traffic. There can be no question that under the Federal Aviation Act of 1958 (49 U.S.C.A. § 1301 et seq.) FAA has the power and authority to regulate the flight of aircraft through the navigable airspace of the United States and to assign the use of airspace upon such terms and conditions as may be necessary to insure the safety of aircraft. In recognition of this authority, the Port Authority and the airlines entered into an agreement on February 12, 1952 with the Civil Aeronautics Administration (predecessor of the FAA), in which all parties agreed that the FAA had full power to establish and approve operating procedures of the airlines, including all air traffic control and procedures for approaches and take-offs at airports. On the other hand, the Port Authority also has power and authority to regulate land structures and the use of its runways at its airports.

It is unnecessary to decide in this case whether the FAA possesses the power and authority to pre-empt the area of regulating the use of the runways for purposes of air traffic control into and out of LaGuardia Airport. The issue here is whether the FAA has actually attempted to exercise such power and authority in opposition to the Port Authority's regulations and has thus frozen the area. Cf., South Carolina State Highway Dep't v. Barnwell Bros., 1938, 303 U.S. 177, 58 S.Ct. 510, 82 L.Ed. 734. The answer depends upon the interpretation of Tower Bulletin 66–5, listing a preferential system of landings and take-offs on runways 4–22 at LaGuardia Airport. The affidavit of Oscar Bakke, Eastern Regional Director of FAA, indicates that the Port Authority's regulations relative to the use of runways 4–22 will under certain conditions of wind direction and velocity "complicate and place an unnecessary burden on air traffic control and derogate from the efficient movement of air commerce." But the letter of August 11, 1966 to the Port Authority from William F. McKee, Federal Aviation Administrator, who the Court must assume is

---

8. United contends that the noise abatement claim is insubstantial because the noise will not be abated on or after the completion of runways 13–31 on November 15, 1966. Port Authority answers that (a) after November 15, 1966 windows will be closed and the noise will be less penetrating, and (b) the completion and use of runways 13–31 will substantially reduce jet aircraft traffic on runways 4–22.

the final arbitrator of the question, states, among other things, that "in making the runway available for the fullest use required by safety considerations we are not directing that the runway be used." In fact, the Administrator has no objection if "the Port and the airlines decide to continue their agreements to restrict the use of runway 4–22" so long as the airlines are "required to abide by other applicable Federal Aviation Regulations." One must conclude from these statements that while the FAA believes that runways 4–22 can be safely used, it is not prepared at the present time to direct their use in the interest of safety or to pre-empt the regulation of its use in contradiction of Port Authority's rules and regulations. Buttressing this conclusion is the fact that although fully advised of this proceeding (see affidavit of Oscar Bakke), the FAA has made no effort to intervene. Cf., Allegheny Airlines v. Village of Cedarhurst, 2 Cir. 1956, 238 F.2d 812.

*Port Authority is entitled to injunctive relief without a showing of irreparable damage or loss.*

It is agreed that the success of the Port Authority's application depends upon whether in this type of case it must establish irreparable damage or loss before it is entitled to injunctive relief. United predicates its attack upon the theory that the application is for a preliminary injunction and as such the Port Authority has failed to show irreparable damage or loss.[9]

■■ This is a diversity case, which ordinarily requires the application of State law under Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. But United argues that since the appeal is one for injunctive relief ad-dressed to the Federal equity jurisdiction of this Court as a procedural matter, Federal law must govern, citing Sprague v. Ticonic Nat. Bank, 1939, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184. Although the proceeding is in the form of an application for a preliminary injunction, which is essentially a procedural issue, it is, as a matter of substance, in the same category as an application for a permanent injunction. This is so because the determination of the application will be final and conclusive and no further hearing is required. Moreover, the remedy sought is so inextricably interwoven with the substantive right invaded that the denial of the remedy would be tantamount to the denial of the right. For both of these reasons New York law, rather than Federal law, is applicable. See, Franke v. Wiltschek, 2 Cir. 1953, 209 F.2d 493, and 7 Moore, Federal Practice, ¶ 65.18[1], at 1682 (2d ed. 1955). At all events, the question seems to be academic because while there may be a difference between the Federal and State law applicable to preliminary injunctions, there has been no showing that there is any difference between the Federal law and the New York law applicable to determination of permanent injunctions.[10]

■ It can hardly be denied that by using runways 4–22 on August 20, 1966 and August 23, 1966, and by threatening to continue to use the same, United violated the Port Authority's regulations and its agreement with the Port Authority. These regulations and agreements must be construed as a restrictive covenant limiting United's right under its lease with the Port Authority to use the runways and affording the Port Authority the same type of relief granted upon a breach of such covenants. It is black

---

9. Port Authority claims it has suffered irreparable damage and loss resulting from open defiance of its regulations and agreements between the parties, which encourages repetition thereof by others and undermines its ability to perform its obligation to manage and operate its airports.

10. Rule 65, Fed.Rules Civ.Proc., 28 U.S. C.A., requires a hearing and compliance with certain terms and conditions prior to the issuance of temporary restraining orders and preliminary injunctions which are more stringent than the requirements of New York State law. Since the application is viewed as one for a permanent injunction, this rule is inapplicable.

letter law that a landlord is entitled to injunctive relief against a tenant who violates such a covenant without a showing of irreparable damage or loss. This is so not because damages do not exist but because such damages are speculative and unless injunctive relief is granted, the wrong would be irremediable. Such a wrong is in the category of a technical trespass upon real property.

The leading case on the subject is Steward v. Winters, 1847, 4 Sandf. Ch. 587, where a landlord sought an injunction against the use of his premises as an auction gallery in violation of a restrictive covenant in a lease limiting the user of the premises to a "regular drygoods jobbing business". In granting the injunction the court said:

"So far as the injury is concerned, it is therefore unnecessary for the complainant to establish that it will be irreparable; or on a continuing covenant, that it will be substantially injurious." (p. 591),

and also:

"The owner of land, selling or leasing it, may insist upon just such covenants as he pleases, touching the use and mode of enjoyment of the land; and he is not to be defeated when the covenant is broken, by the opinion of any number of persons, that the breach occasions him no substantial injury. He has a right to define the injury for himself, and the party contracting with him must abide by the definition." (p. 590).

In Wheelock v. Noonan, 1888, 108 N.Y. 179, 15 N.E. 67, the defendant was the grantee of an oral license to place rocks upon plaintiff's property on the condition that he would remove the same. This he failed to do and thereupon the plaintiff withdrew his permission. The court held that the defendant was a trespasser and granted equitable relief, stating (p. 185, 15 N.E. p. 69): " * * * The wrong in every such case is a continued unlawful occupation, and any remedy which does not or may not end it is not adequate to redress the injury or restore the injured party to his rights. * * * "

Round Lake Association v. Kellogg, 1894, 141 N.Y. 348, 36 N.E. 326, is particularly in point. There the lease was made "subject to all the rules and regulations which may from time to time be adopted" by the landlord, one of which prohibited the sale of merchandise by the tenant without the landlord's permission. The court granted the landlord injunctive relief compelling the tenant to observe such rules and regulations.

More recently, in Lyon v. Bethlehem Engineering Corp., 1930, 253 N.Y. 111, 170 N.E. 512, where a tenant attempted to erect on the roof of a building a large sign in violation of the terms of a lease, the court, in granting injunctive relief, said (p. 115, 170 N.E. p. 514):

"It would be strange indeed if the landlord, who, by express terms, has limited the tenant's rights as to the use and occupancy of the building in question, should be held to be powerless to prevent its use for the purpose to which the defendants have attempted to put it.

A court of equity may, by injunction, prevent the defendants from using the building for a purpose which violates the restrictive covenants of the lease."

To the same effect is Stewart v. Turney, 1923, 237 N.Y. 117, 142 N.E. 437, 31 A.L.R. 960, and Laroy v. Andstein Building Corporation, 1924, 209 App.Div. 895, 205 N.Y.S. 400.

The facts disclosed by the record in this case clearly demonstrate according to the above precedents that the Port Authority is entitled to the aid of a court of equity to compel United to comply with the Port Authority's regulations and agreements without a showing of irreparable damage or loss. The terms of the injunctive decree will also provide (i) that runways 4–22 shall be used as soon as runways 13–31 are completed or on November 16, 1966, whichever is sooner, and (ii) that any time runways 13–31 cannot be used because of adverse wind conditions, thereby requiring the use of runways 4–22 under FAA's Tower Bulletin 66–5, then the Port Authority shall

make available appropriate runways for United's use either at the Kennedy Airport or at the Newark Airport and if this is impossible, then the use of runways 4–22 will be permitted for landings on runway 4 and take-offs on runway 22.

The above will constitute an order unless the parties wish to submit a more formal decree within five (5) days upon two (2) days' notice.