### In re BRANIFF AIRWAYS, INCORPORATED, Debtor.

**James W. TOREN and Wilmington Trust Company as Trustees of the BRNF Liquidating Trust, Plaintiffs,**

v.

**BRANIFF, INC., Defendant.**

**Bankruptcy No. 482–00369.**
**Adv. Nos. 484–4375, 484–4374.**

United States Bankruptcy Court,
N.D. Texas,
Fort Worth Division.

Dec. 13, 1984.

Stephen E. Herrmann, William J. Wade, William W. Bowser, Richards, Layton & Finger, Lyndell Kirkley, Brown, Herman, Scott, Dean & Miles, Fort Worth, Tex. for James W. Toren and Wilmington Trust Co.

Robert H. Mow, Jr., Lyman G. Hughes, Peter Tierney, Carrington, Coleman, Sloman & Blumenthal, Dallas, Tex., for Braniff, Inc.

## MEMORANDUM OPINION

MICHAEL M. McCONNELL, Bankruptcy Judge.

JAMES W. TOREN and WILMINGTON TRUST COMPANY, as Trustees of the BRNF LIQUIDATING TRUST, filed the above Adversary Proceeding on October 30, 1984, (No. 484–4375) in this Court seeking (1) a declaratory judgment that a proposal by Braniff, Inc. to enter into Joint Services and Operations Agreements with third-party airlines will violate Sections, 6, 8 and 20 of the Lease Agreement by and between BRNF Liquidating Trust and New Braniff and (2) a permanent injunction preventing New Braniff from entering into or carrying out the terms of the proposed Joint Services and Operations Agreements. BRANIFF, INC. in turn filed a second Adversary Proceeding (No. 484–4374) seeking a declaratory judgment that the Joint Services and Operations Agreements do not violate the terms of the Lease Agreement. The cases were subsequently consolidated for all purposes pursuant to Rule 7042 of the Bankruptcy Rules.

Following an expedited discovery schedule, the consolidated Adversary Proceedings came on for trial before the Court on November 26, 1984. Braniff, Inc. waived its previously filed jury demand and all parties consented to the entry of a final judgment by this Court. The presentation of evidence by the parties was concluded on November 27th, and the parties have submitted post-trial briefs.

The Court, now having heard the evidence and the arguments of counsel, enters the following findings of fact and conclu-

sions of law pursuant to Rule 7052 of the Bankruptcy Rules:

## FINDINGS OF FACT

### The Braniff Plan of Reorganization

1. On May 13, 1982, Braniff Airways, Incorporated ("Airways") filed a petition for reorganization under Chapter 11 of the Bankruptcy Code and thereafter continued in possession of its properties and the management of its business as a debtor-in-possession.

2. Following several abortive attempts by management to reorganize Braniff by business arrangements with various airlines including Pan Am, Pacific Southwest Airlines, Inc., Peoples Express and others, Braniff finally entered into a Memorandum of Agreement with Hyatt Corporation ("the Hyatt Agreement") on May 12, 1983 whereby Braniff, subject to the approval of this Court and its creditors, would be able to resume operation of a scheduled domestic airline.

3. The Memorandum of Understanding between Hyatt and Braniff provided a basis for reorganizing Braniff in a way that would permit the resumption of airline operations. That Memorandum of Understanding provides in part that:

"Hyatt is willing to make equity investments in, and loans (or facilitate loans) to the debtors on the terms and conditions provided below provided the Plan is revised in a manner reasonably satisfactory to all interested persons to provide for a Dallas/Fort Worth based airline operation with 30 aircraft."

4. The Hyatt Agreement defines New Braniff to mean a "corporate subsidiary of Airways to be created pursuant to Section 3.10 hereof to operate a scheduled domestic airline system with its hub at DFW."

5. In Section 10.07 of the Hyatt Agreement, "Hyatt agrees to use its best efforts to cause New Braniff to commence, and so long as economically reasonable, to continue airline operations as contemplated by this Agreement and the Plan.".

6. On July 15, 1983, Airways submitted a Disclosure Statement and Plan of Reorganization, incorporating the terms of the Hyatt proposal, (the "Disclosure Statement") to all known holders of a claim against Airways or equity security interests in Airways "in order to disclose information deemed adequate for the claimants to make an informed decision in exercising their rights to vote for acceptance or rejection of the ... Plan."

7. The Plan included and incorporated by reference the Hyatt Agreement, which includes the Lease, the Senior Debt Protocol and all other addenda and exhibits attached thereto.

8. The Disclosure Statement contains an overview of the Plan which provides that "[t]he Plan contemplates that Braniff would be reorganized and ... through a subsidiary to be formed would resume operation of a scheduled domestic airline route system with its hub at Dallas-Fort Worth Regional Airport using 30 Boeing 727–200 aircraft, which will be leased to such subsidiary by a liquidating trust ... to be established for the benefit of the holders of Airways' senior debt ...".

9. The Disclosure Statement contains a summary of the Plan which provides that "According to Debtors' analyses, the Plan should afford Airways the opportunity and ability to reorganize its corporate structure and resume airline operations, through a newly incorporated subsidiary, and to continue in business as a viable and profitable going concern in an operating mode not likely to be followed by liquidation and without the need for further financial reorganization. Specifically, it is the best judgment of the Debtors that a transfer of certain of their assets to their secured creditors and a continuation of the business of airways is in the best overall interests of those with a stake in the Debtors." The summary of the Plan further provides "It is anticipated that Airways, through New Braniff, will resume a scheduled domestic airline route system with its hub at Dallas-Fort Worth Regional Airport using 30 of the Boeing 727–200 aircraft presently

owned by Airways, which will be leased to New Braniff by a liquidating trust to be established by Airways pursuant to the Plan for the benefit of Airways' Senior creditors."

10. The Disclosure Statement contained financial information respecting the reorganized Debtors, which was prepared by the Debtors and which the Debtors deemed "material, important and necessary for the creditors and equity securities holders to make an informed judgment about the Plan and to exercise their right to vote for acceptance or rejection of the Plan." Such financial information included the "New Braniff Condensed Statement of Operations."

11. The New Braniff Condensed Statement of Operations contained in the Disclosure Statement shows revenue projections based solely on passenger revenues and the notes thereto indicate as well that revenues are based solely on passenger traffic on New Braniff's proposed route system.

12. The Plan provided that it would be implemented on the Consummation Date by, *inter alia,* "resumption of a scheduled domestic airline as contemplated by the Hyatt Agreement.".

13. On September 1, 1983, this Court entered an Order confirming the Plan of Reorganization of Braniff Airways, Incorporated and Braniff International Corporation (the "Plan"). On December 15, 1983, the United States District Court for the Northern District of Texas affirmed the Bankruptcy Court Order confirming the Plan. *Bank of New York v. Braniff Airways, Inc.,* No. CA4–83–471E (N.D.Tex., Dec. 15, 1983).

14. The Plan was substantially consummated pursuant to its terms on December 15, 1983.

15. At the time of consummation, Braniff Airways changed its name to Dalfort Corporation and, in accordance with the Plan, created a subsidiary named Braniff, Inc. (Braniff, Inc. is referred to herein and in the Plan as "New Braniff")

16. Pursuant to the Plan, at the time of consummation thereof, a liquidating trust, the BRNF Liquidating Trust (the "Trust") was established for the benefit of secured creditors of Airways and holders of secured debentures of Airways. Various assets of Airways subject to the lien of the Indenture of Mortgage and Deed of Trust between Airways and Fidelity Union Bank, dated as of November 20, 1980, including the aircraft of Airways, were thereupon transferred to the Trust.

17. James W. Toren and Wilmington Trust Company (the "Trustees") became the trustees of the Trust on December 15, 1983.

### The Lease Agreement

18. On December 15, 1983, pursuant to the Plan and Hyatt Agreement, the Trustees and New Braniff entered into a lease (the "Lease") relating to, among other assets, the 30 Boeing 727–200 aircraft. The Lease contemplated that the 30 aircraft under the Lease would be used by New Braniff for the resumption of a scheduled domestic airline route system with its hub at DFW.

19. Section 6 of the Lease provides in pertinent part that New Braniff will not, directly or indirectly, create, incur, assume or suffer to exist any security interest, mortgage, pledge, lien, charge, encumbrance or claim on or with respect to the aircraft, title thereto or any interest therein.

20. Section 8 of the Lease provides in pertinent part that New Braniff will not, without the prior written consent of the Trustees, sublease or otherwise in any manner deliver, transfer or relinquish possession of any airframe or engine.

21. Section 20(b) of the Lease provides that the Lease and all or any part of New Braniff's rights thereunder shall not be assigned, transferred or otherwise conveyed by New Braniff without the express written consent of the Trustees.

22. In the event that New Braniff could not successfully fly 30 aircraft and might

want to fly 26 or some other number in scheduled New Braniff service, New Braniff wanted the flexibility of being able to return some but less than all of the aircraft. Therefore, New Braniff sought to have the right to return some but less than all of the aircraft. The secured creditors also wanted New Braniff to have a means of returning some but less than all of the aircraft if it were unable to make it on a 30 aircraft basis. As a result, Section 3(c) was included in the Lease, which permits New Braniff to return fewer than all of the aircraft to the Trust upon sixty days notice. Section 3(c) provides in pertinent part that:

"(c) *Partial Termination.* Lessee may, at its sole option, from time to time terminate this Lease as to any Aircraft by giving written notice of such termination to Lessor at least sixty (60) days in advance of the desired date of such termination. In the event that Lessee exercises its right to terminate as to any Aircraft under this subsection (c), Lessee shall pay to Lessor upon the effective date of such termination all fixed rent and other amounts payable by Lessee hereunder to the date of such termination together with a termination payment equal to the amount, if any, by which $100,000 for each month or partial month elapsing from the Service Date to the effective date of such termination exceeds the aggregate amount of Fixed Rent theretofore paid in respect of such Aircraft pursuant to subsection 4(a) hereof. Whenever Lessee exercises its option to terminate this Lease as to any Aircraft pursuant to this subsection 3(c), Lessee shall so terminate this Lease with respect to at least five (5) Aircraft, provided, however, that if the termination date selected under this subsection 3(c) shall coincide with the end of any Initial Term or Renewal Term under subsection 3(a), then Lessee may exercise its option under this subsection 3(c) as to fewer than five (5) Aircraft so long as the total number of Aircraft as to which this Lease shall terminate on such termination date shall be five (5) or more. Partial terminations under this subsec-

tion 3(c) shall apply to such subparagraph of subsection 3(a) as Lessee shall designate at the time of such partial termination. For every two Aircraft as to which this Lease is terminated either (x) by reason of the provisions of this subsection 3(c), or (y) by reason of non-renewal under the provisions of subsection 3(a), this Lease shall also be deemed terminated with respect to one Spare Engine."

## Operations of New Braniff

23. New Braniff began airline operations on March 1, 1984, under its virtually unrestricted carrier operating certificate and certificate of public convenience. For several months it flew routes similar to those operated by Airways with its "hub" at Dallas/Fort Worth International Airport.

24. New Braniff experienced greater consumer resistance than anticipated, and as a result, Braniff at least twice revised its marketing plan and changed the mix of services which it offered in a continuing attempt to be profitable. Despite a variety of marketing strategies, New Braniff consistently reported financial losses operating as a scheduled airline. It posted a $30.6 million loss for its first fiscal quarter and a loss of $39.8 million for the second quarter.

25. Beginning in the summer of 1984, New Braniff sought to find ways to use the aircraft in other than a New Braniff scheduled route system. In this regard, New Braniff contacted many airlines and other entities concerning such alternative uses for the aircraft.

26. On October 9, 1984, New Braniff announced by press release that it had been engaged in preliminary discussions with a number of airlines concerning viable economic uses for the aircraft. Prior to that date, New Braniff had provided proposed term sheets outlining the parameters of possible agreements to other carriers, including Midway Airlines and Continental Airlines.

27. On October 15, 1984, the Trustees wrote to the President of New Braniff and requested information regarding the transactions which New Braniff was considering with other air carriers in order that the Trustees could determine whether approval of the Lessor was required under the terms of the Lease.

28. On October 24, 1984, New Braniff publicly announced a comprehensive redeployment and consolidation plan effective November 15, 1984. The plan included a reduction in New Braniff's scheduled operating fleet from thirty to ten aircraft and certain "Joint Services Agreements" for the remaining twenty aircraft.

29. New Braniff is presently operating a regularly scheduled airline out of DFW with 8 or 9 of the Aircraft leased from the Trust. On selected days, up to 13 aircraft are used in the active fleet.

### The Northeastern Agreement

30. On November 6, 1984, New Braniff and Northeastern International Airways, Inc. ("Northeastern") entered into a "Joint Services and Operations Agreement By and Between Braniff, Inc. and Northeastern International Airways, Inc." (the "JSA"). Braniff has expressed an intent to enter into similar agreements with other airlines. A copy of the JSA was admitted into evidence as Plaintiffs' Exhibit No. 3.

31. The JSA is unique. It is not similar to "Equipment Interchange Agreements" or "Interim Operating and Joint Service Agreements" entered into by Airways prior to reorganization. There is also no common definition of a "Joint Services and Operations Agreement" in the airline industry.

32. Although Braniff vigorously denies that the JSA is a "sublease" under Texas law, Braniff concedes that the JSA fits the generic classification of a "charter" or "wet-lease". A "wet-lease", as the term is loosely used in the airline industry, refers to the charter or lease of an aircraft with a crew.

33. New Braniff, as had its predecessor Airways, has entered into charter agreements under which New Braniff used its aircraft to furnish flying services in transporting passengers arranged for or ticketed by the charterer (or the chartering party). These charters sometimes involved one trip, sometimes many trips. In these arrangements, the destinations, or routing, and the scheduling of the aircraft are normally handled by the chartering party. On occasion, the interior of the aircraft was reconfigured to suit the needs of the chartering party.

34. For the period March 1, 1984 through August 3, 1984, the revenues which New Braniff received from revenue block hours attributable to nonscheduled service amounted to .28% (.0028) of revenues received from total block hours, attributable to both scheduled service and non-scheduled service.

35. Under the JSA, the amount payable on a monthly basis for each aircraft is $90,000.00 a month. The current monthly rental that New Braniff is paying to the Trust for each of the aircraft is also $90,000.00.

36. Under the JSA, New Braniff has built elements of profitability into payments other than the rental payments on the aircraft, including the payment for general administrative expense, maintenance reserves, insurance provisions and other provisions for payments from Northeastern to New Braniff.

37. The amounts charged by New Braniff to Northeastern under the JSA are calculated without regard to the number of passengers or amount of cargo carried on any Northeastern flight conducted with the aircraft.

38. The aircraft subject to the JSA are to be specifically indicated on Exhibit A thereto.

39. The specific period of time the JSA is to be in effect is set thereon.

40. Northeastern is entitled to all profits from use of the aircraft under the JSA.

41. Scheduling of the aircraft for use by Northeastern is done by Northeastern.

42. Northeastern controls the number of passengers on the aircraft and the fare charged to such passengers.

43. Northeastern is responsible for damages to the aircraft during flight.

44. Northeastern obtains landing permits and pays landing fees in connection with flights using the aircraft.

45. Northeastern controls the selection of and pays the supplier of fuel for the aircraft.

46. Northeastern has the right to reconfigure the aircraft.

47. Northeastern pays all crew expenses (salary and all benefits) for crews on Northeastern flights using the aircraft.

48. Northeastern reimburses New Braniff for all taxes relating to use of the aircraft.

49. Northeastern controls the selection of the supplier of and pays for food and other passenger amenities used on the aircraft.

50. Northeastern controls baggage handling on flights using the aircraft.

51. Flight operations by Northeastern using the New Braniff aircraft are conducted approximately nine or ten hours per day.

52. A "Delivery date" is provided for in Section 8.01 of the JSA and is cited throughout.

53. There is a provision for "return" of the aircraft in Sections 1.01, 1.02 and 8.03 of the JSA.

54. Section 8.03 of the JSA provides for "rent" for the aircraft.

55. Section 12.02(E) of the JSA provides for New Braniff to retain rights under Section 1110 of the Federal Bankruptcy Code. Section 1110 rights are available only where there has been a lease of aircraft.

56. Under Section 8.03 of the JSA, Northeastern is required to pay a penalty of $9,341.40 per day for each day after the term of the JSA that an aircraft has not been "duly returned."

57. The concepts of "delivery," "return" and "rent" used in the JSA are all consistent with the delivery, in part, of possession and control of the aircraft by New Braniff to Northeastern. Recitations against transfer of possession and control in the JSA notwithstanding, it defies logic and common sense that elements of possession and control of the aircraft were not given to Northeastern in the "bundle of rights" catalogued in the JSA for which Northeastern is paying a valuable consideration.

58. Section 8 of the Lease prohibits New Braniff from *in any manner* delivering, transferring, or relinquishing possession of any aircraft or engine. While the JSA may not fit any accepted definition or legal test of a "sublease" under Texas law, New Braniff has certainly violated the prohibition in the Lease against "transfer" or "delivery" *in any manner* of the aircraft.

59. Moreover, Section 8 expressly recites that no subleasing, deliver, transfer or relinquishment of possession may take place *"except as contemplated hereby"*. The Disclosure Statement expressly recites that the Plan "contemplates" a regularly scheduled air service with a hub at DFW. Although the parties certainly contemplated routine charters of individual aircraft as is common in the airline industry, agreements such as the JSA depart radically from industry norms. Indeed, Mr. Ferguson testified that he saw no prohibition to entering into such agreements with respect to *every aircraft* leased from the Trust. Surely, the JSA is the type of agreement about which the secured creditors wanted New Braniff to seek consent from the Trustees in order that their interests would be protected.

60. The JSA violates both the spirit and the letter of the Lease. It is obvious from the language of the Lease that the parties anticipated that a 30 aircraft fleet might become unprofitable, but when Section 3(c) and Section 8 of the Lease are read together, it is apparent that the mechanism con-

templated by the parties to the Lease with respect to aircraft involved in unprofitable operations was the return of aircraft to the Trust under 3(c). If the aircraft were not returned, Section 8 was inserted to require the consent of the Trustees before agreements such as the JSA could be consummated with third-parties.

61. Any finding of fact stated herein which is deemed to be a conclusion of law is hereby adopted as a conclusion of law.

## CONCLUSIONS OF LAW

1. Pursuant to 28 U.S.C. § 157(c)(2), all parties to the proceeding have in open court agreed that this is "related" proceeding for jurisdictional purposes, and have consented to this proceeding being heard and a final decision being rendered by this Court. This Court, therefore, has jurisdiction to conduct the trial of this proceeding, to enter these Findings of Fact and Conclusions of Law, and to enter a Final Judgment on such findings and conclusions.

2. The Lease Agreement provides in Section 23 that in all respects it is to be governed by and construed in accordance with the laws of the State of Texas, including all matters of construction, validity and performance.

3. Under Texas law, the question of whether a document is ambiguous is a mixed question of fact and law. *Skelly Oil Company v. Archer*, 356 S.W.2d 774, 163 Tex. 336 (1961); *Cox v. Bell Helicopter Inter.*, 425 F.Supp. 99 (N.D.Tex.1977).

4. The following portions of Sections 6, 8 and 20 of the Lease are clear, direct and unambiguous:

*Section 6*: Lessee will not, directly or indirectly, create, incur, assume, or suffer to exist any security interest, mortgage, pledge, lien, charge, encumbrance, or claim on or with respect to the Leased Property, title thereto or any interest therein, except ... [provisions and not directly involved here are omitted].

*Section 8*: Lessee will not without the prior written consent of Lessor, sublease or otherwise in any manner deliver, transfer or relinquish possession of any

aircraft or engine, except as contemplated hereby.

*Section 20(b)*: This Lease and all or any part of Lessee's rights hereunder shall not be assigned, transferred, or otherwise conveyed by Lessee without the express written consent of the Lessor.

5. There is no latent ambiguity in the portions of such sections quoted in Conclusion of Law No. 4 above.

■ 6. In construing the Lease, the Court's main task is to glean the parties' intent from the language of the Lease as a whole. *Benson v. Jones*, 578 S.W.2d 480, 484 (Tex.Civ.App.—Corpus Christi 1979, writ ref'd n.r.e.). Looking solely within the four corners of the Lease, it is apparent that the JSA is wholly inconsistent with the intent of the parties. The manifest intent of the parties was that New Braniff would actively operate a fleet of aircraft, and not transform itself into a wet-leasing concern.

7. Several provisions of the Lease indicate that the intent of the parties was that the success or failure of the venture should turn on the success or failure of New Braniff. Under Section 6, the parties provided for "Contingent Rent", based in part on operating profits of New Braniff. Further, under Section 12, the Lease provides that New Braniff's financial health is to be closely monitored, since the Lessors are dependent upon the financial health and business success of New Braniff.

8. Under the JSA, however, the Lessors have become dependent not upon New Braniff, but upon Northeastern. Such a result flies in the fact of the Lease. While Sections 6 and 12 of the Lease may retain theoretical significance under a Joint Services Agreement, such an agreement thwarts their manifest intent.

9. In negotiating the Lease, the parties obviously considered the possibility that New Braniff would have financial problems, and put specific provisions in the Lease to deal with this possibility. Section 3(b) of the Lease provides for the early termination of the Lease by New Braniff in

the event that New Braniff does not earn any profits from the operation of the Leased Property. Likewise, Section 3(c) of the Lease provides for partial termination of the Lease upon 60 days notice at the option of New Braniff. These sections provide an easy escape from the Lease for New Braniff if it is unable to make the payments required under the Lease. Moreover, these sections insure the right of the Trustees to recover the Leased Property in this situation. The Lease thus contemplates that the parties will be returned to the *status quo* should New Braniff's financial difficulties resurface.

10. Thus, insofar as Sections 3(b) and (c) specifically contemplate New Braniff's present financial situation, they are the sole means by which New Braniff is able to cease use of the Leased Property. The JSA threatens the Trustees' right and ability to determine with whom it must deal under the Lease. Insofar as it removes the Leased Property from New Braniff's possession, the JSA interferes with the Trustees' ability to recover the Leased Property in the specific situations for which they sought protection in the Lease. The JSA radically shifts the balance of power between the parties as set out in the Lease, and leaves the Trustees' right to reclaim the aircraft impaired.

11. More generally, the JSA violates the intent of Sections 3 and 6 by impairing the Lessor's ability to retrieve the Leased Property in the event of a default by New Braniff. The JSA substantially increases the risk that the Trustees will not be able to retrieve the Leased Property, a risk that the Trustees did not assume in their bargain with New Braniff.

12. New Braniff argues that the Trustees' right to the return of the aircraft would not be impaired if Northeastern filed for bankruptcy. New Braniff cites no Bankruptcy Code authority for its proposition, relying instead upon pre-Code decisions which are no longer applicable.

13. If Northeastern were to seek protection under the Bankruptcy Code prior to a default under the JSA, the JSA would at least be subject to assumption or rejection by the Northeastern under 11 U.S.C. § 365. Northeastern would have sixty days after the order of relief to assume or reject or under 11 U.S.C. § 1110 sixty days to cure the default. 11 U.S.C. § 1110. Further, Section 108(b) gives Northeastern sixty days to make the necessary payments to perform. *See generally Moody v. Amoco Oil Co.*, 734 F.2d 1200 (7th Cir.1984). If the agreement was affirmed, Northeastern would be entitled to keep the planes for the balance of the six month term. If rejected, the planes would not be returned for a minimum of 60 days.

14. If Northeastern sought bankruptcy at a time when the JSA was in default and thus arguably terminated, the planes might not be returned immediately. First, because Northeastern would have possession of the planes, the Trustees would be required to seek relief from the automatic stay. 11 U.S.C. § 362(d)(2). *Matter of GSVC Restaurant Corp.*, 3 B.R. 491 (Bkrtcy.S.D.N.Y.1980); *Matter of R.R.S., Inc.*, 7 B.R. 870 (Bkrtcy.M.D.Fla.1980). Further, Northeastern could argue that despite the alleged termination, its rights under Sections 365 and 1110 were not extinguished. As a court of equity, a Bankruptcy Court might examine the termination to see, for example, whether it violated equitable principles or state anti-forfeiture provisions. *See Hazen v. Hospitality Associates, Inc. (In Re Hospitality Associates, Inc.*, 6 B.R. 778 (Bkrtcy.Or.1980); *Grand Hudson Corp. v. GSVC Restaurant Corp. (In Re GSVC Restaurant Corp)*, 10 B.R. 300 (S.D.N.Y.1980).

15. In Section 12.02(E) of the JSA, New Braniff seeks to retain for itself rights which it would have under Section 1110 of the United States Bankruptcy Code in the event that Northeastern filed under Chapter 11 of the Bankruptcy Code. However, this reservation under Section 1110 does not remove the impediments to recovering aircraft which would be created by Northeastern filing bankruptcy. Rather, Section 1110 merely provides some protection with regard to the timing for the recovery of the

aircraft and engines where there is a Chapter 11 bankruptcy proceeding. Further, Section 1110 provides absolutely no protection if Northeastern should seek protection under Chapter 7 of the Bankruptcy Code.

 16. In determining whether equitable relief in the form of a permanent injunction is available to the Trust, the Court must determine the equities between the parties, the threat of irreparable harm, and determine whether there is an adequate remedy at law if the injunction is denied. *Lewis v. S.S. Baune*, 534 F.2d 1115, 1123–1124 (5th Cir.1976). Speaking for the panel, Judge Coleman commented as follows on the burden of proof necessary for the grant of a permanent injunction: .

> In not all cases where the petitioner fails to show irreparable injury will he still be denied a permanent injunction, see e.g. *Port of New York Authority v. Eastern Air Lines, Inc.*, E.D.N.Y.1966, 259 F.Supp. 745. Whereas the essential finding that must be made to issue a TRO or preliminary injunction is irreparable injury, *the essential prerequisite to a permanent injunction is the unavailability of an adequate remedy at law.* Irreparable injury is, however, one basis, and probably the major one, for showing the inadequacy of any legal remedy, see 11 Wright & Miller, *Federal Practice & Procedure* § 2944 at 399–401 (1973). Often times the concepts of "irreparable injury" and "no adequate remedy at law" are indistinguishable. The court in *Bannercraft Clothing Co. v. Renegotiation Board*, 1972, 151 U.S.App.D.C. 174, 466 F.2d 345, rev'd 1974, 415 U.S. 1, 94 S.Ct. 1028, 39 L.Ed.2d 123, acknowledged the frequent indistinguishability but went on to say: "the irreparable injury rubric is intended to describe the quality or severity of the harm necessary to trigger equitable intervention. In contrast, the inadequate remedy test looks to the possibilities of alternative modes of relief, however serious the initial injury". 466 F.2d at 356 n. 9. (emphasis ours)

17. The Trust would be irreparably harmed if a permanent injunction was not ordered. Courts have held that a lessor is "irreparably harmed" when its right to retake its property is impaired. *Dunker v. Field & Tule Club*, 6 Cal.App. 524, 92 P. 502 (1907). *See also Hood v. Foster*, 194 Miss. 812, 13 So.2d 652, 654 (1943) ("irreparable injury" is an act which seriously changes the property it affects either physically or in the character in which it has been held and enjoyed); *Cobb v. Milwaukee County*, 60 Wis.2d 99, 208 N.W.2d 848 (1973) (an injunction is available to prevent threatened violations of a restrictive convenant); *Goldberg v. Tri-States Theatre Corporation*, 126 F.2d 26 (8th Cir.1942) (if an assignment of a lease is made for the express purpose of defeating or evading a restrictive agreement, equity has no hesitancy in enforcing the restrictive agreement). The JSA does change the Trustees' right to retake the Leased Property, because under the agreement, the Leased Property is subject to Northeastern's claim of possession.

 18. An inadequate remedy at law is shown under the facts of this case, as well, by the threat of a multiplicity of suits. The Trustees should not be forced to bring separate injunctive actions each time New Braniff attempts to enter agreements substantially similar to the Northeastern JSA. Equity will assume jurisdiction to award relief by injunction where the injured party cannot procure the full and complete relief to which he is entitled without resorting to a multiplicity of suits. Prevention of a multiplicity of suits is a well-recognized basis for the assumption and exercise of the power to restrain acts injurious to personal and property rights, and to prevent a person from being subjected to the costs and vexation of innumerable suits. The doctrine which is founded on the theory of affording a speedy and efficient administration of justice and promoting the convenience of the parties, is fully applicable in this consolidated action. *Iowa Center Association v. Watson*, 456 F.Supp. 1108, 1113 (N.D.Ill.1978); Wright & Miller, 11

*Federal Practice and Procedure:* Civil § 2944.

19. To paraphrase the court in *De Noie v. Board of Regents of University of Texas System,* 609 S.W.2d 601 (Tex.App.1980), if the trustees were forced to file suit against New Braniff each time New Braniff entered into a joint services agreement or similar agreement, this would result in a multiplicity of suits. There is, therefore, no adequate remedy at law. As the Texas Supreme Court stated in *Repka v. American National Insurance Co.,* 143 Tex. 542, 186 S.W.2d 977 (1945):

> It is firmly established that equity will assume jurisdiction for the purpose of preventing a multiplicity of suits, *the general principle being that the necessity of a multiplicity of suits in itself constitutes the inadequacy of the remedy at law which confers equitable jurisdiction.*

186 S.W.2d at 981 (emphasis supplied).

20. Section 22 of the Lease provides that the Trustees are entitled to be indemnified and held harmless from and against any and all costs and expenses, including but not limited to reasonable attorneys fees and expenses, which may in any way result from or arise out of or in relation to the delivery, lease, possession, return, disposition, use or operation of the aircraft, whether in the air or on the ground, or from the Lease.

21. Both the first-filed New Braniff action (Adversary No. 484–4374) and the Trustees' action (Adversary No. 484–4375) seek a declaratory judgment and other relief with respect to the Lease. Therefore, the Trustees contend that they are entitled to be indemnified by New Braniff from and against all costs and expenses which the Trustees may incur in connection with this consolidated proceeding.

22. The Trust and the Trustees are not entitled to indemnification and reimbursement pursuant to Section 22(b) for their cost and expenses, including but not limited to reasonable attorney's fees and expenses, in connection with Adversary Proceeding No. 484–4374 and Adversary Proceeding No. 484–4375. The language of the Lease is obviously aimed at third-party claims. If the parties had intended to contract for the payment of attorneys fees to a party to the Lease seeking to enforce rights under the Lease, they certainly would have adopted more direct and explicit language to that effect.

23. Any conclusion of law stated herein which is deemed to be a finding of fact is herein adopted as a finding of fact.

24. Judgment shall be entered accordingly.